Leopold W. MAHLER and Helen E. Mahler, his wife, and Bertha Ebertsheim, Appellants,

v.

UNITED STATES of America.

No. 13726.

United States Court of Appeals Third Circuit.

Argued Feb. 6, 1962.

Decided June 27, 1962.

714

Robert A. Cohen, Pittsburgh, Pa. (Goldstock, Schwartz, Cohen & S .hwartz, Pittsburgh, Pa., on the brief), for appellants.

Jerome I. Levinson, Washington, D. C. (William H. Orrick, Jr., Asst. Atty. Gen., Joseph S. Ammerman, U. S. Atty., Alan S. Rosenthal, Atty., Dept. of Justice, Washington, D. C., on the brief), for appellee.

Before BIGGS, Chief Judge, and McLAUGHLIN and HASTIE, Circuit Judges.

BIGGS, Chief Judge.

■ Jurisdiction in the case at bar is asserted under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671–2680, to recover damages for property damage and personal injuries suffered by the plaintiffs-appellants, when the car in

which they were riding on September 21, 1958, ran into a large boulder that had fallen from a steep embankment onto the Penn-Lincoln Parkway in Pittsburgh, Pennsylvania. The portion of the Penn-Lincoln project at which the boulder had fallen and the accident occurred was constructed with a 50% grant-in-aid from the federal government under the federal aid highway program. See 23 U.S.C. §§ 1–175 (1952 ed.).[1] The court below, on motion for summary judgment made by the appellee, the United States, pursuant to Rule 56, Fed.R.Civ.Proc., 28 U.S.C., entered judgment for the United States, basing that judgment on, among other things, Section 288 of the Restatement of the Law of Torts.[2] The court below held in substance that assuming for the purposes of the motion for summary judgment that there was no adequate inspection or supervision of the highway by the Secretary of Commerce and that such an inspection was a duty made mandatory by 23 U.S.C. § 13, nonetheless the United States could not be liable for damages under the law of Pennsylvania. The court did not deal with the contentions of the United States that the claims were based on the discretionary-function exception of the Tort Claims Act, 28 U.S.C. § 2680(a), and that Section 7 of the Federal-Aid Road Act of 1916, 23 U.S.C. § 48, excepts the United States from liability.[3] The United States approaches the problem in this court by making the correct primary assertion that there can be no liability in tort in Pennsylvania, as elsewhere, unless a defendant is guilty of a breach of some legal duty owed by him to the plaintiff. Zayc v. John Hancock Mut. Life Ins. Co., 338 Pa. 426, 430–431, 13 A.2d 34, 36–37 (1940). The plaintiffs assert that the Federal Highway Program imposed a duty, owing the travelling public, on the United States to make sure that the segment of the road on which the accident occurred was constructed and maintained properly. They contend that the United States failed to fulfill its duty in three respects: first, by causing to be approved by the Secretary of Commerce defective plans for the project submitted to it by the Pennsylvania Department of Highways pursuant to 23 U.S.C. § 12 and by participating in planning conferences held during the preparation of the defective plans; second, by failing to discover faulty construction by inspections carried out by the Bureau of Public Roads pursuant to 23 U.S.C. § 13; and third and last, by failing to provide for and make inspections after construction was completed which, according to the allegations of the complaint as amended, would have revealed defective maintenance by the Commonwealth of Pennsylvania. The last point is bottomed upon the periodic maintenance inspections conducted by the Bureau of Public Roads. See 23 U.S.C. §§ 15, 48 and Bureau of Public Roads Policy and Procedure Memorandum 21–11.1.

■ Since the motion for summary judgment was granted, we must accept appellants' version of the facts. See, e. g., Proctor v. Sagamore Big Game

1. Citations to 23 U.S.C. are to the 1952 edition (including Supp. V) through August 27, 1958 (before which time the negligent acts and omissions are alleged to have taken place). This legislation was recodified in part and superseded in part on the above date, 72 Stat. 885–921, 23 U.S.C.A. § 101 et seq., although the purpose was not to change the substance of the provisions. S.Rept. No. 1928, 85th Cong., 2d Sess., U.S.Code Cong. and Adm.News 1958, p. 3942.

2. As follows: "The violation of a legislative enactment by doing a prohibited act or by failing to do a required act, does not make the actor liable for an invasion of an interest of another caused thereby, if the enactment is designed exclusively:

"(a) to protect the interests of the state or municipality, as such, or

"(b) to secure to individuals the enjoyment of rights or privileges to which they are entitled only as members of the public, or

"(c) to impose upon the actor the performance of a service which the state or municipality undertakes to give to the public, except where the actor is under a contract duty to perform a service which the state or municipality is under a legal duty to give."

3. See D.C., 196 F.Supp. 362 (1961).

Club, 265 F.2d 196 (3 Cir.), cert. denied, 361 U.S. 831, 80 S.Ct. 81, 4 L.Ed.2d 73 (1959). When the case is viewed in this light and the exception provisions of 28 U.S.C. § 2680 are, for the moment, put to one side, there is no doubt that under the law of Pennsylvania the United States must be deemed to have breached its duty to the plaintiffs, if the provisions referred to in the preceding paragraph of this opinion for approval of the project and for its inspection imposed duties for the benefit of the travelling public. See Bollin v. Elevator Construction & Repair Co., 361 Pa. 7, 63 A.2d 19, 6 A.L.R.2d 277 (1949). Should this be so, recovery may be had by the plaintiffs against the United States under the Federal Tort Claims Act, which provides that the government shall be held liable when injury or death is caused by the negligent or wrongful act or omission of an employee of the government while acting within the scope of his office or employment and under circumstances where the United States, if a private person, would be liable in accordance with the law of the place where the act or omission occurred, 28 U.S.C. § 1346(b). Our inquiry therefore must be directed toward ascertaining the intent of Congress in enacting the pertinent legislation.

Our conclusions are aided greatly by the relevant legislative history. We state preliminarily that when legislating in respect to roads Congress acts under the authority conferred upon it by Article I, Section 8, of the Constitution to regulate interstate commerce, to establish post roads, and to provide by expenditure of tax revenues for the National Defense and the General Welfare. But it is clear nonetheless that the construction, maintenance and the regulation of highways have remained state functions. South Carolina State Highway Department v. Barnwell Bros., 303 U.S. 177, 187, 58 S.Ct. 510, 514, 82 L.Ed. 734 (1938). In the cited case Mr. Justice Stone said: "From the beginning it has been recognized that a state can, if it sees fit, build and maintain its own highways, canals and railroads and that in the absence of Congressional action their regulation is peculiarly within its competence, even though interstate commerce is materially affected. Minnesota Rate Cases [Simpson v. Shepard], 230 U.S. 352, 416 [33 S.Ct. 729, 57 L.Ed. 1511]. Congress not acting, state regulation of intrastate carriers has been upheld regardless of its effect upon interstate commerce. Id. With respect to the extent and nature of the local interests to be protected and the unavoidable effect upon interstate and intrastate commerce alike, regulations of the use of the highways are akin to local regulation of rivers, harbors, piers and docks, quarantine regulations, and game laws, which, Congress not acting, have been sustained even though they materially interfere with interstate commerce." 303 U.S. at 187–188, 58 S.Ct. at 515. In note 5 cited to the text, Mr. Justice Stone cites a large number of cases in which the Supreme Court has upheld state regulations materially affecting interstate commerce. In Maurer v. Boardman, 336 Pa. 17, 7 A.2d 466 (1939), aff'd sub nom. Maurer v. Hamilton, 309 U.S. 598, 60 S.Ct. 726, 84 L.Ed. 969 (1940), it was held that the highways in Pennsylvania are owned by the Commonwealth and that their preservation and the maintenance of safety on them are a concern of the state. It seems clear from the Acts of Congress and their accompanying legislative history, that grants-in-aid under the Federal Highway Program were and are designed to encourage states to construct their own highways and that the primary function of the Bureau of Public Roads, in approving plans submitted to it by a state and inspecting roads during and after construction, is that of making sure that federal appropriations are being utilized properly and efficiently by the respective states and are not being wasted.

Funds appropriated by Congress for the highway program are apportioned to the states according to a statutory formula, 23 U.S.C. §§ 21, 21a, 21a-2. The states then create general programs to employ these funds and prepare estimates for each project. 23 U.S.C. § 12. Con-

struction contracts are awarded by the states. The states pay the contractor and the respective states become and remain responsible for supervision of construction and for the maintenance of the highways after completion. 23 U.S.C. §§ 13, 15. The states are at all times the owners of the roads and are primarily responsible for their operation.

Under the Federal Highway Program the Bureau of Public Roads approves the projects and detailed plans of construction submitted by the respective states before it assumes any obligation to reimburse any state for a percentage of construction costs. 23 U.S.C. § 12. It also assures itself, by inspection, that the construction is in accordance with the plans agreed upon. 23 U.S.C. §§ 13, 14, albeit subject to the direct supervision of the state. 23 U.S.C. § 13. If the Bureau decides that a state is not maintaining properly a highway constructed with funds supplied by the United States it notifies the state and if, within a specified time, proper maintenance is not effected, federal aid funds are withheld in the future. 23 U.S.C. §§ 15 and 48.

The statutory scheme shows a weighting of the functions to be performed by the states and the Bureau of Public Roads, acting for the United States. The states are given what has been aptly described as "operational control" of the projects. Congress gave the Bureau veto power insofar as the use of federal funds were concerned.

The legislative history of the original Federal-Aid Road Act of 1916, 39 Stat. 355, makes the intent of Congress, at least insofar as that Act was concerned, clear indeed. During the period of time in which the Penn-Lincoln project was designed and constructed, the obligation of the Bureau of Public Roads to approve construction plans, to inspect the roads during their construction, and to withhold funds if the states failed to maintain properly highways constructed with federal funds was imposed on the Bureau by the statutes referred to above. All find their source in the Federal-Aid Road Act of 1916.[4]

H.R. 7617, which, as amended, became the Federal-Aid Road Act of 1916, was reported by the House Committee on Roads with the note that "primarily roads are local concerns and jurisdiction over them belongs to the States and local authorities." H.Rep.No. 26, 64th Cong., 1st Sess. p. 4. But, "while the States and local authorities ought not to be ousted from jurisdiction over roads within their borders, yet Federal funds appropriated for roads must be rigidly safeguarded. It must be seen to that every dollar of this money expended secures a dollar's worth of road construction and road maintenance. To accomplish this, very large discretionary powers have, by this bill, been given to the Secretary of Agriculture."[5] Id., at pp. 4–5. That the purpose of the powers given to the federal government was to protect public funds is made clear by the comments of Representative Saunders, a member of the House Committee on Roads, who stated:

"As I said, if a project of road development is desired to be submitted by a State, that State approaches the Federal Government through its road commission.

"In other words, the unit is the State. The representative of that commission presents the project to the Agricultural Department, giving a sufficient outline of the improvement desired to enable the experts of the Agricultural Department to determine in advance whether the proposition is, or is not, meritorious. Then if the department is inclined to think that the proposition thus presented is meritorious, and worthy of aid out of that proportion of the gen-

---

4. Act of July 11, 1916, ch. 241, §§ 6, 7, 39 Stat. 357–358.

5. These powers are now exercised by the Secretary of Commerce. See 1939 Reorg. Plan No. 1, 53 Stat. 1426; Act of June 30, 1949, § 103(a), 63 Stat. 380; 1949 Reorg.Plan No. 7, 63 Stat. 1070.

eral fund which is segregated for that particular State, it may call upon the State to furnish further information, and such data, estimates, and plans as will enable the experts of the department to determine the cost of construction, and the full merits of the project, in a word to determine in relation to the case submitted everything that the Federal department ought to know before reaching its conclusions.

"Having advanced thus far, if the department approves the project as a whole, the State is authorized to proceed with the work. When the work is concluded, and it is ascertained by the Federal department through its appropriate agents, that the work has been done according to the plans approved by its experts, then the department may make payment of the sum which has been decided upon for this particular project of road construction, improvement, or maintenance. Will any gentleman on this floor suggest that up to this point there is anything of authority lacking to the Federal Government to enable it to safeguard the expenditure of its money, or to compel the construction of the improvements contemplated, upon the terms agreed on between the contracting sovereignties?" 53 Cong.Rec. 1281.

Representative Saunders stated that the federal interest was protected by the provisions for inspection during construction to insure that work should be done in accordance with the approved plans and a colloquy ensued between him and Representative McLaughlin, 53 Cong.Rec. 1530, as follows:

"Representative McLaughlin. The Secretary of Agriculture is apprised as to the money that has been expended in the State, but this bill directs him by actual inspection of the work to know that the money has been properly expended.

"Representative Saunders. Certainly, and that provision is intended to safeguard the Federal interest.

The Department of Agriculture in the discharge of its duty can not, and ought not, to expend a dollar under this bill, until it is thoroughly satisfied that the work arranged for has been done in absolute conformity with the requirements of the department. Hence, as I have said, the payment is not one for future expenditures, but is compensation for work already done, and already approved by the Secretary of Agriculture."

That the provision for submission of the plans to the federal government for approval had the same purpose is made clear by an exchange between Representatives King and Saunders:

"Mr. King. The final determination rests with the Federal department at Washington?

"Mr. Saunders. Yes, it can put a veto on any proposition that the State submits. I submit that under this bill it will be impossible to expend the money of the Government wastefully and extravagantly, unless the Agricultural Department is corrupt, or inefficient." 53 Cong.Rec. 1282.

The intent of the House with regard to the overall effect of the protective devices written into the bill was expressed by two members of the Committee on Roads:

"Mr. Browne. * * * [Y]ou have the Secretary of Agriculture of the United States and his experts to say what kind of a road shall be built and whether a particular road is one that should have Federal aid or not. I think that the money the Government is called upon to appropriate is safeguarded in every way, and that the Government can be sure that the money appropriated by it is going to be used wisely and economically". 53 Cong.Rec. 1274.

"Mr. Saunders. * * * Further, we expect to satisfy the most exacting critic of this measure that the interests of the Federal Treasury

are adequately safeguarded, and that every precaution has been taken to guarantee that the Federal contribution in aid of road construction, will be wisely, economically, and judiciously expended. As guardians of the Federal Treasury we should surround the expenditure of Federal money with appropriate protective provisions. This we have done." 53 Cong.Rec. 1280.

In reporting the amended version of H.R. 7617, the Senate Committee on Post Offices and Post Roads agreed with the House that expenditure of federal funds must be protected:

"No policy of federal aid should be adopted which does not permit the retention by the States of the fullest measure of control consistent with the necessary inspection and safeguarding which is customary with all Federal appropriations. This balance of powers and duties as between the Federal Government and the States can readily be accomplished by leaving to the States the initiative in determining whether or not they desire to avail themselves of Government aid, the direct supervision of every step of the construction and improvement, leaving only to the Federal Government the fullest measure of latitude in the way of inspection and approval at each step of the undertaking. This should provide, at the same time, harmony and efficiency without overlapping of duties and without clashing of interests or authority." S.Rep. No. 250, 64th Cong., 1st Sess., pp. 15–16.

The Committee, however, did not agree with members of the House who maintained that the bill as passed by the House met this need. The Report stated, at pp. 22–23:

"The bill H.R. 7617, passed by the House of Representatives * * * is most seriously defective in its failure to afford reasonable inspection and safeguarding on the part of the Federal Government of the Federal appropriations. A careful reading of section 3 of the House bill reveals the fact that no power is vested in the Secretary of Agriculture to disapprove the application by a State highway department for aid under the provisions of the act unless the road for which aid is sought fails to come within the provisions of the act. Inasmuch as the act passed by the House brings practically every class of roads in the United States within the provisions of the act, the Secretary of Agriculture would have no power to disapprove the application * * *. He is given no power of approval or disapproval of the plans, surveys, specifications, and estimates, but is only authorized to examine them and determine what would be a reasonable cost of the proposed improvement."

In writing stronger safeguards into the bill, the Senate Committee thought that an adequate procedure had been achieved:

"Initiative on the part of the States in availing themselves of the benefits of Federal aid is provided in section 6, and in the same section they are further called upon to make all surveys, plans, specifications, and estimates for improvements to be made under the terms of the act, and it is further provided that the States shall have direct supervision of construction. Thus is reserved to the States all that could possibly be expected by the most earnest advocate of State rights. The same section, however, provides adequate safeguards by vesting in the Secretary of Agriculture the power of approval of the applications made by the States, the surveys, plans, specifications, and estimates furnished by them, and he is given the power of inspection and approval of the work as it progresses. This is an admirably balanced plan of cooperation, and there seems to be no reason why it should not produce excellent results." Id. at p. 21.

Senator Bankhead, in moving H.R. 7616 on the floor,[6] stated, 53 Cong.Rec. 6429:

"The highway commission of the State * * * submit[s] the plans; they designate the road to be built, its location, and the estimate for the improvement, to the Secretary of Agriculture; and while I regret, Mr. President, that we found it necessary to do so, we had to lodge the veto power somewhere, and we thought it best to give to the Secretary of Agriculture the power to say: 'That is not a proper road to be built; it is not in a proper place; the construction of it is not what it ought to be; the estimate of cost is too high; and I am not, as the representative of the Government of the United States, willing to approve it and put up half the money for it.' That is the proposition."

When H.R. 7617 passed the House of Representatives it contained no provision requiring the maintenance of a federal-aid road when constructed. The Senate considered this to be a defect and accordingly H.R. 7617 was amended to add the provision which became Section 7 of the 1916 Act. See S.Rep. No. 250, 64th Cong., 1st Sess., p. 22. In substance Section 7, 39 Stat. 358, imposed the duty of maintenance of the roads upon the states or their civil subdivisions, according to state law, and provided that if "at any time" the Secretary of Agriculture found that a highway was not being properly maintained he should give notice to the offending state and after four months if the state had not put the road into proper condition of maintenance, the Secretary should thereafter refuse to approve any project for road construction in the offending state. H.R. 7617 as originally brought to the Senate floor provided that the Secretary was authorized to withhold approval of any project for road building in an offending state. By an amendment, 53 Cong.Rec. 6584, the duty was made mandatory, the bill providing that the Secretary of Agriculture "shall thereafter refuse to approve any project for road construction in said State * * *".

This was to avoid waste of federal funds. Senator Harding stated, 53 Cong. Rec. 6580:

"I do not hesitate to say that the greatest crime in public expenditures to-day is the wanton waste of money in the construction of roads without ample provision for their maintenance."

Senator Norris said, 53 Cong.Rec. 6783:

"A State that shall not have the machinery for road maintenance and a State that does not keep such machinery actively in operation to maintain the roads ought not to have Federal assistance in building other roads. It is true that when the roads are all built, if the State does not maintain them they would go to ruin, and the Federal Government could not help itself. About the only thing we can do is to say to the State, 'If you do not maintain this road, which we in part construct out of the Federal Treasury, then we will give you no more money to help construct other roads' * * *. [T]he real place where this amendment[7] would be applicable, Senators, would be in case some State had no such

6. The Senate Committee version as amended on the floor of the Senate by amendments not relevant here became in fact the Federal Aid Road Act of 1916, 39 Stat. 355. See Sen.Rep. No. 250, 64th Cong., 1st Sess.

7. The amendment referred to by Senator Norris was offered by him and was an attempt to eliminate the provision for notice by the Secretary prior to the withholding of federal funds for future projects because of the failure of maintenance by a state. See 53 Cong.Rec. 6580–6584, 6782–6785. The Norris amendment was not adopted but there can be no question that there was agreement in the Senate that after notice federal funds should be withheld. See 53 Cong.Rec. 6840–6841; Federal-Aid Road Act of 1916, § 7, 39 Stat. 358.

machinery and made no attempt to maintain its roads, and when that is evident, then we ought to stop paying out the public money for the construction of roads in that State. It seems to me that it would be only fair that we should do that, and that as a practical defense of the Treasury of the United States we ought to do that."

The recital of legislative history of federal-aid legislation might be prolonged to a much greater length but what we have said makes it clear, we think, that in enacting the provisions respecting approval and inspection by the federal government, it was not the intention of Congress to impose a duty on the Secretary of Commerce, on the Bureau of Public Roads, or on the United States or any of its agencies, to make sure that a member of the travelling public, a user of a federal-aid highway, was not injured because of negligence in carrying out these provisions. The concern of Congress was to make sure that federal funds were effectively employed and not wasted.[8]

The pertinent provisions of the Federal-Aid Road Act of 1916 were incorporated into the Federal Highway Act of 1921, 42 Stat. 212. The concern of the Congress in 1916 that federal funds be not dissipated but used effectively by the states is reiterated in a House report on S. 1072, the bill which became the Act of 1921, as follows: "The purpose in presenting this bill to Congress is to provide amendments to the present law and to outline a definite plan for road construction, as well as to make such requirements as will conserve the public funds * * *." H.Rep. No. 162, 67th Cong., 1st Sess., p. 4. The basic structure thus created by these statutes has been the foundation for all subsequent federal highway legislation. See S.Rep. No. 1965, 84th Cong., 2d Sess., p. 4 (1956); Report of the President's Advisory Committee on a National Highway Program, H.Doc. No. 93, 84th Cong., 1st Sess., p. 4 (1955); Levin, Federal Aspects of the Interstate Highway Program, 38 Neb.L.Rev. 377, 378 (1959); Note, 108 U.Pa.L.Rev. 534, 538–539 (1960). In light of the legislative history traced above, it is plain that the appellants cannot successfully rely on the federal highway acts unless they are able to show that legislation following the Act of 1921 has affixed to the inspection and approval sections the additional purpose of securing the safety of those using the federal-aid highways.

Although Congress early exhibited an awareness of the problem of highway

---

8. This conclusion is aided by the decision in United States v. Neustadt, 366 U.S. 696, 81 S.Ct. 1294, 6 L.Ed.2d 614 (1961). In that case an attempt was made to hold the United States liable under the Federal Tort Claims Act by the purchaser of a residential property who had been furnished a statement reporting the results of an inaccurate FHA inspection and appraisal and who, relying on it, had been induced by the seller to pay a purchase price in excess of the fair market value of the property. True, in the cited case the Supreme Court concluded that the case turned upon the correct interpretation of Section 2680(h), Title 28 U.S.C., which precluded recovery under the Act upon "[a]ny claim arising out of * * * misrepresentation". But in reaching the determination that Congress had no intention of making FHA appraisals an exception to the "misrepresentation" rule in the FTCA, the Supreme Court stated, id. at p. 709, 81 S.Ct. at p. 1301, that the "primary and predominant objective of the appraisal system was the 'protection of the Government and its insurance funds' ", basing its conclusion on the legislative history of the National Housing Act of 1934, as amended, 12 U.S.C.A. § 1701 et seq. See notes 20, 21 and 22, cited to the text at 366 U.S. 709, 81 S.Ct. 1301. We think that the legislative history set forth at length above, while not so explicit as that cited by Mr. Justice Whittaker in Neustadt, is persuasive in demonstrating that the congressional purpose in providing for design approval and road inspections was essentially the same as that which requires FHA appraisals. See also Weinstein v. United States, 244 F.2d 68 (3 Cir.), cert. denied, 355 U.S. 868, 78 S.Ct. 116, 2 L.Ed. 2d 74 (1957). Compare Somerset Seafood Co. v. United States, 193 F.2d 631 (4 Cir. 1951).

safety[9] and this awareness has continued to manifest itself in legislation dealing with the federal highway program,[10] we have discovered nothing which would indicate that Congress has redesigned the inspections during and after construction to function as anything more than that which was originally intended, viz., a means of protecting the federal investment. Without such an expansion of purpose, the inspection provisions of the statute do not create a duty running to these plaintiffs.

Inasmuch as we find that the federal statutes relating to inspection of highways do not create a duty on the part of the United States running to the plaintiffs, the only remaining basis for liability under the Tort Claims Act, if there be any, must be general Pennsylvania law. We have carefully weighed the appellants' arguments and the authorities cited by them as well as the facts in the record which the appellants claim support their position. But we have been directed to and we have discovered no Pennsylvania rule of law which would impose liability on a private person under similar circumstances. Bollin v. Elevator Construction & Repair Co., 361 Pa. 7, 63 A.2d 19, 6 A.L.R.2d 277 (1949), relied on by the appellants, does not aid them. In the cited case, Pennsylvania law provided for mandatory periodic inspections of elevators. 35 P.S. § 1347. Obviously, the statute was enacted to provide for the safety of those who ride elevators. See 35 P.S. §§ 1348, 1349. Pursuant to 35 P.S. § 1345, if an elevator is insured by a company authorized to insure elevators in the Commonwealth, the inspection of the elevator "may be made" by an employee of the insurance company. The Pennsylvania Supreme Court held that if an insurance company chooses to exercise the inspection right given by Section 1345, the statute imposes a duty on the company to inspect with care, this duty running to those using or operating the elevator. In contrast, the legislative history of the highway acts indicates that federal inspections were designed for the limited purpose of safeguarding the government's financial interest and that a duty such as that present in the Bollin case was not intended by Congress. There being no cognizable duty found to be owing the plaintiff-appellants by virtue of the inspection sections of the statute, we are of the opinion that Pennsylvania law provides no basis for liability on the part of the United States for the alleged negligence in carrying out the provisions of 23 U.S.C. §§ 13, 15, 48.

The claim asserting negligence by the United States in approving the plans submitted by the Commonwealth, pursuant to 23 U.S.C. § 12, cannot be dismissed on this ground. Although the legislative history of the original enactment indicates that the purpose of federal approval of highway plans and specifications was limited in the same fashion as was federal inspection, Congress has since specifically directed that highway safety also be considered in passing on submitted highway designs. Section 12 of the Federal Aid Highway Act of 1938, 52 Stat. 636, provided as follows: *"Hereafter the Secretary of Agriculture shall approve only* such methods of bidding and *such plans and specifications of highway construction for the type or types proposed as will be* effective in securing competition and *conducive to safety,* durability, and economy of mainte-

9. See Section 18 of the Federal Highway Act of 1921, 42 Stat. 216, which provided that the Secretary should make necessary recommendations to the Congress and the state highway departments regarding preservation of the highways and assurance of the "safety of traffic thereon."

10. See Federal-Aid Highway Act of 1944, § 12, 58 Stat. 843 (now 23 U.S.C.A. § 109 (d) (Supp.1961); Federal-Aid Highway Act of 1952, § 9, 66 Stat. 161 (now 23 U.S.C.A. § 313 (Supp.1961)); Federal-Aid Highway Act of 1954, § 10(a), 68 Stat. 74 (now 23 U.S.C.A. § 307(a) (Supp.1961); Federal-Aid Highway Act of 1958, § 12, 72 Stat. 95 (now 23 U.S. C.A. § 131) (Supp.1961).

nance."[11] In so legislating, Congress made safety a consideration in federal approval of a federal-aid highway project. In effect, the Secretary's approval is a certification that the plans and specifications are "conducive to safety". There can be little doubt that the acts of negligence alleged, if made out, would constitute a breach of Section 12 of the Act of 1938. However, assuming without deciding that this breach brings the United States within the doctrine of Bollin v. Elevator Repair & Construction Co., supra, the government cannot be held liable under the Federal Tort Claims Act for its participation in formulating the plans and subsequent approval thereof. The statutory language pertaining to safety is one of numerous standards to which the Secretary of Commerce must look in determining whether or not approval is to be given to the design and specifications for a highway project. We cannot avoid the conclusion that this determination by the Secretary, as well as any active participation by the federal government in the design, falls within the discretionary function exception to the Federal Tort Claims Act, 28 U.S.C. § 2680(a).[12] Such a result seems to us to be compelled by the Supreme Court's opinion in Dalehite v. United States, 346 U.S. 15, 73 S.Ct. 956, 97 L.Ed. 1427 (1953). It is there stated, at pp. 35–36,

73 S.Ct. at p. 968: "[T]he 'discretionary function or duty' that cannot form a basis for suit under the Tort Claims Act includes more than the initiation of programs and activities. It also includes determinations made by executives or administrators in establishing plans, specifications or schedules of operations. Where there is room for policy judgment and decision there is discretion."[13] The Court found the United States not liable for decisions made "at a planning rather than operational level and * * * [involving] considerations more or less important to the practicability of the Government's fertilizer program." 346 U.S. at p. 42, 73 S.Ct. at p. 971. The determination by the Secretary of Commerce to approve the plans and specifications for the Penn-Lincoln project, the decision which initiated the federal government's financial participation, was obviously a policy judgment[14] of the type most important to the success of the federal-aid highway program. It is administrative action requiring the conscious weighing of such factors as location and anticipation of future traffic flow. The same must be said of federal guidance during the pre-approval design stage. As such, we think that these decisions fall on the planning side of the planning-operational distinction drawn in the Dalehite case, subsequently adopted and approved

11. Emphasis added. Codified in the 1952 edition of the United States Code as amended, at 23 U.S.C. § 8a; now found at 23 U.S.C.A. § 109(a) (Supp.1961). The legislative history indicates that this provision was designed primarily to protect the federal investment. See 83 Cong. Rec. 6383–6384 (1938). However, the italicized language expresses what must be regarded as at least a subsidiary purpose, that of promoting the construction of safe highways.

12. "The provisions of this chapter and section 1346(b) of this title shall not apply to—
    "(a) Any claim * * * based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused."

13. Although there are portions of the Dalehite opinion which are no longer authoritative, we do not read Rayonier, Inc. v. United States, 352 U.S. 315, 77 S.Ct. 374, 1 L.Ed.2d 354 (1957) or Indian Towing Co. v. United States, 350 U.S. 61, 76 S.Ct. 122, 100 L.Ed. 48 (1955), as having retracted the language quoted. Therefore the plaintiffs' citation of Jemison v. The Duplex, 163 F.Supp. 947 (S.D. Ala.1958), a case decided against the United States on analogous facts, must be rejected, inasmuch as we are unable to reconcile the holding in that case with the pertinent language of Dalehite.

14. See S.Rep. No. 250, 64th Cong., 1st Sess., pp. 22–23 (1916); H.Rep. No. 26, 64th Cong., 1st Sess., p. 4 (1916); 53 Cong.Rec. 6429 (1916) (remarks of Senator Bankhead).

in Eastern Airlines, Inc. v. Union Trust Co., 95 U.S.App.D.C. 189, 221 F.2d 62, 76–77 (D.C.Cir.), aff'd per curiam sub nom. United States v. Union Trust Co., 350 U.S. 907, 76 S.Ct. 192, 100 L.Ed. 799 (1955).[15] Thus, in the instant case Section 2680(a) withdraws the government's waiver of immunity, insofar as the complaint is based on the allegedly negligent planning and approval of the highway project by the Secretary of Commerce.

For these reasons, the judgment of the district court will be affirmed.

15. See also Dahlstrom v. United States, 228 F.2d 819 (8 Cir. 1956).