716 F.2d 865
 C.P. SQUIRE CONTRACTORS, INC., Appellant,
v.
The UNITED STATES of America, Appellee,
v.
DISTRICT OF COLUMBIA REDEVELOPMENT LAND AGENCY, Third Party Appellee.
 Appeal No. 83-644.
 United States Court of Appeals,
Federal Circuit.
 Aug. 30, 1983.
 
 Carl M. Fink, Washington, D.C., argued for appellant.
 Kathleen A. Flynn, Washington, D.C., argued for appellee. With him on brief were J. Paul McGrath, Asst. Atty. Gen., David M. Cohen, Director and Donnie Hoover, Asst. Director, Washington, D.C.
 Before MARKEY, Chief Judge, SKELTON, Senior Circuit Judge, and NIES, Circuit Judge.
 SKELTON, Senior Circuit Judge.
 
 
 1
 The decision of the United States Claims Court, 1 Cl.Ct. 615, dated November 5, 1982, dismissing the complaint is affirmed.
 
 
 2
 This is the second time that this case has been appealed. The first appeal was to a predecessor court, the United States Court of Claims, which issued a final order on July 25, 1980, remanding the case to its trial division for further proceedings. C.P. Squire Contractors, Inc. v. United States, 224 Ct.Cl. 765, 770 (1980). Further proceedings were held in the Court of Claims Trial Division in accordance with the order. Subsequently, the case was transferred to the United States Claims Court in accordance with the Court Improvement Act of 1982. Thereafter, the Claims Court entered an appealable order dismissing the complaint. The Petitioner (appellant here) C.P. Squire Contractors, Inc., has appealed the case to this court. The United States (appellee) has invoked the "law of the case" doctrine, citing Northern Helex Co. v. United States, 634 F.2d 557 (Ct.Cl.1980), contending that we are bound by the order of the Court of Claims cited above as the law of the case on this appeal. We agree as to the issues considered by that court and disposed of by its order. Those issues, as well as the nature of the case, are set forth in the order of the court which we quote in pertinent part as follows:
 
 
 3
 "This case concerns the extent of defendant's liability under 42 U.S.C. Sec. 1452b. The case is before the court on defendant's motion for summary judgment. For the reasons set out below, there exists a dispute as to facts material to disposition of defendant's motion. We therefore dismiss defendant's motion. However, to properly frame the issues, we also define the scope of plaintiff's potential recovery.
 
 
 4
 Pursuant to 42 U.S.C. Sec. 1452b, the Secretary of the Department of Housing and Urban Development (HUD) was authorized to make low-interest rehabilitation loans, commonly known as "Section 312 loans," to the owners and tenants of certain designated properties. The goal was to encourage such persons to rehabilitate their properties by affording them the financial means to do so. In carrying out this function, the Secretary of HUD was authorized "to delegate to or use as his agent any Federal or local public or private agency or organization to the extent he determines appropriate and desirable to carry out the objectives of [42 U.S.C. Sec. 1452b]." 42 U.S.C. Sec. 1452b(f). The Secretary designated the District of Columbia Redevelopment Land Agency (RLA) to assist HUD in making such loans within the District of Columbia. This was accomplished by having HUD and RLA enter into a contract denominated "Agreement for Public Body Approval of Section 312 Rehabilitation Loans" (the Agreement). Section 1 of the Agreement in relevant part provided that:
 
 
 5
 * * * The Purpose of this Agreement is to extend to the Public Body authority to approve, in accordance with the regulations, policies, and requirements (hereinafter called "Regulations") of the Secretary, certain applications for Section 312 loans, subject to verification by the Secretary of funds availability for an approved loan.
 
 
 6
 RLA was a "Public Body" within the meaning of this Agreement. HUD prepared a Rehabilitation Financing Handbook (Handbook) which prescribed the policies, procedures, and requirements to be followed by public bodies in, among other things, approving loans. The scope of RLA's authority to act as HUD's agent is therefore defined and limited by the Agreement and Handbook considered together.
 
 
 7
 To the extent here relevant, the Section 312 loan program in the District of Columbia apparently functioned as follows. If an eligible homeowner was interested in applying for such a loan, RLA would first prepare a construction contract. This document contained a description of the rehabilitation work to be done, indicated the source of payment would be a Section 312 loan, and also incorporated by reference a document entitled "General Conditions for Rehabilitation, Part I." Copies of the contract were sent to contractors interested in performing such rehabilitation work. The contractors would in turn indicate the price at which they would perform the described work. After such bids had been received, RLA would aid the homeowner in selecting an acceptable contractor. RLA acting on behalf of HUD pursuant to the delegation of authority in Section 2 of the Agreement would next approve the homeowner's application for the Section 312 loan.[1] However, Section 2 also provided such approval was not valid until HUD had first determined funds were available from which to make the loan and had notified RLA to that effect. Section 3 of the Agreement required such notification to be in writing.[2] Thus, only after receipt of such written notification would loan approval become effective and a valid and enforceable loan arise between HUD and the homeowner. RLA would next (1) inform the homeowner his loan was approved and (2) have the homeowner and the selected contractor execute the construction contract. Following contract execution, actual rehabilitation work would commence.
 
 
 8
 Apparently in accordance with this procedure, plaintiff entered into a total of 14 such contracts. Work was allegedly performed under only nine of the contracts. Per plaintiff, with respect to these nine, pursuant to oral and written change orders authorized by RLA, plaintiff was directed to and did perform additional work not originally called for under such contracts. Plaintiff insists it has not been paid for such additional work and seeks to recover payment from HUD. Plaintiff also contends that because it was not paid for this work it lacked sufficient funds to even commence performance on the other five contracts. Plaintiff therefore also seeks damages for its inability to perform these contracts. Because of the interdependent nature of plaintiff's claims and without passing on their merits, it can potentially recover with regard to the latter five contracts only if HUD was in fact obligated to pay for the additional work allegedly performed.
 
 
 9
 Assuming plaintiff did perform additional work, it is possible for it to recover at least in part. Each of the contracts signed by plaintiff apparently incorporated by reference General Conditions for Rehabilitation, Part I (General Conditions). Section 108.C of such General Conditions authorized additional work to be performed pursuant to change orders approved by RLA and set forth the procedure to be followed by RLA in approving such orders. Section 108.C was arguably promulgated pursuant to a delegation of authority from HUD. As previously indicated, the scope of authority delegated to RLA was in part defined by the Handbook. Chapter 19 of the Handbook set out the general conditions which public bodies were authorized to include in rehabilitation construction contracts. Chapter 19, Section 3 in part states that "[t]he Public Body [RLA] may add other provisions to the general conditions * * * to assure that the contract clearly sets forth the requirements for the construction work to be done." Section 108.C of such General Conditions is arguably described within this language. If so, then when RLA promulgated Section 108.C, it did so under an express delegation of authority. This also suggests that to the extent RLA approved additional work in accordance with Section 108.C it acted on behalf of HUD, making HUD potentially liable to pay for such work. The initial factual difficulty is the lack of facts necessary to determine whether Chapter 19, Section 3 is a delegation of authority broad enough to authorize a provision such as Section 108.C, and if so, whether RLA's approval in accordance with Section 108.C would obligate HUD to pay for the work.
 
 
 10
 A further difficulty is ascertaining whether any of the alleged additional work was performed under change orders approved by RLA in accordance with Section 108.C. Assuming RLA had authority to approve additional work and thereby obligate HUD to pay for it, HUD would be so bound only to the extent Section 108.C was complied with. If RLA approved change orders not complying with Section 108.C, it would be acting outside the scope of its delegated authority, making HUD not liable to pay for such work. E.g., Federal Crop Insurance Corp. v. Merrill, 332 U.S. 380, 68 S.Ct. 1, 92 L.Ed. 10 (1947). Though not exhaustive of the procedure to be followed, only written change orders could be approved by RLA.[3] Section 108.C.1. Furthermore, plaintiff stated in its petition that the additional work caused it to incur additional costs not covered by the original contract price. Since plaintiff was, and remains, unwilling to itself absorb this increase, plaintiff is therefore in the posture of seeking an increase in the contract price. Section 108.C.2(d) in part indicated that if a change order required an increase in the contract price, RLA could approve it only if the homeowner had sufficient funds remaining under the loan or grant made to the homeowner to cover the cost of the work to be performed under the change order. With respect to each particular contract, the change orders under which plaintiff could potentially recover could therefore only have been properly approved by RLA to the extent RLA had not yet disbursed to plaintiff the full amount of the loan or grant proceeds. Only to that extent would there be sufficient funds under the loan or grant to cover the cost of the additional work. In addition, in determining the extent of then available loan proceeds, reference must be made to the amounts of the loans as originally approved by HUD. While it may have been possible to increase the amount of the loans, and thereby increase the undisbursed portion available, this could occur only if HUD sent RLA written notice of funds available to cover the loan increase. Agreement, Sections 2 and 3. However, since this notice was never sent, there is no way the loans could have been increased above the originally approved amounts. Plaintiff can therefore potentially recover only for work performed under written change orders and only to the extent the cost of the additional work did not exceed the undisbursed portion of the grant or original loan proceeds. Only to this extent could Section 108.C have been complied with. Unfortunately, we lack the facts necessary to determine to what extent, if any, change orders authorizing the additional work met this two-fold requirement.
 
 
 11
 * * *
 
 
 12
 * * *
 
 
 13
 We note the above discussion does not cover all the arguments that can be or have been made in this case, and we in no way mean to limit the arguments the parties may make on remand. The parties may renew all their arguments after appropriate proceedings have been completed in the trial division. We do not pass on the merits of plaintiff's claim but, rather, deny defendant's motion for summary judgment because of disputed material facts.
 
 
 14
 IT IS THEREFORE ORDERED that defendant's motion is denied without prejudice and the case returned to the trial division for determination of the following issues:
 
 
 15
 1. RLA prepared General Conditions which were apparently incorporated into all the contracts plaintiff entered into. Section 108.C of such General Conditions sets out the procedure to be followed in approving change orders. How many of plaintiff's contracts incorporated these General Conditions? Did HUD either approve, ratify, or otherwise authorize RLA to include Section 108.C in the contracts plaintiff entered into?
 
 
 16
 2. What portion, if any, of the compensation sought by plaintiff is attributable to work performed pursuant to written change orders which were entered into and approved by RLA in compliance with the procedures required by Section 108.C, including the requirement of undisbursed grant or loan proceeds sufficient to cover the cost of the additional work?
 
 
 17
 3. To the extent, if any, that plaintiff performed work pursuant to written change orders which complied with Section 108.C, was RLA acting as HUD's agent when RLA approved such change orders under Section 108.C.2?"
 
 
 18
 * * *
 
 
 19
 * * *
 
 
 20
 On remand, the parties engaged in discovery proceedings in which the appellant admitted in answering interrogatories propounded by the appellee that it had been paid the full contract price on all of the units and had also been paid for all extra work performed under written change orders. Upon receiving this evidence, the trial judge of the Court of Claims, George Willi, ruled that it was clear that neither of the breach claims being asserted by the appellant (i.e., the claim for extra work performed as a result of defective specifications prepared by RLA, and the claim for extra work performed under alleged economic duress, neither of which was covered by a written change order) comes within any of the areas chartered by the Court of Claims as subject to inquiry in remand proceedings. The Trial Judge ruled further that since the appellant had not appealed from the order of the Court of Claims, it was bound by the order as the law of the case. There being no further evidence, the Claims Court, to which the case had been transferred, dismissed the complaint.
 
 
 21
 Before considering the contentions of the appellant in the present appeal, we wish to call attention to additional facts not discussed in the order of the Court of Claims. For instance, the agreement between the government and RLA mentioned by the Court of Claims gave the RLA authority to approve Section 312 Rehabilitation Loans in accordance with the regulations of the Secretary of Housing and Urban Development. The Secretary issued regulations entitled "General Conditions for Rehabilitation." These regulations were included in all of the contracts involved in this case. Section 108.C of the regulations is especially relevant to the claims of appellant, as it definitely requires a written change order approved by RLA before the contractor can perform or be paid for extra work. Section 108.C provides as follows:
 
 
 22
 C. The Owner shall not permit any changes, deletions or additions to the Rehabilitation Work or any change in the terms and conditions of this Agreement except with the approval of the AGENCY by means of a change order issued pursuant to subparagraphs 1) through 3), set forth below, except for the purpose of affording protection against any emergency endangering life or property.
 
 
 23
 1. In order to obtain a Change Order, the Owner shall follow the procedure set forth hereunder:
 
 
 24
 (a) The Owner shall advise the Contractor and the Agency of the Proposed change. The Contractor shall then prepare the appropriate Change Order on a form to be provided the Contractor by the Agency, setting forth the scope of the change, the increase or decrease in the Contract Price and the extra time, if any, it will take to perform the work contemplated in the Change Order and submit it to the Owner within five (5) calendar days after being advised by the Owner of the proposed change. The Owner shall, if the terms are acceptable, sign the Change Order on the place indicated thereon and either the Contractor or the Owner shall submit the said Change Order to the Agency for approval. In the event the Change Order is unacceptable to the Contractor, the Agency shall determine whether he shall be required to perform the work required under the Change Order.
 
 
 25
 (b) The Contractor shall not commence any work contemplated by the Change Order until he has received a copy of the approved change order from the Agency.
 
 
 26
 2. The Agency shall approve the proposed Change Order under the following conditions:
 
 
 27
 (a) If it conforms to provisions of applicable law;
 
 
 28
 (b) If it is consistent with this Agreement;
 
 
 29
 (c) If the time of performance of this Agreement will not be unreasonably delayed.
 
 
 30
 (d) If the Change Order requires an increase in the Contract Price and the Owner has either sufficient funds under the loan or grant made to the Owner, including any contingency funds, or the Owner has deposited with the Agency an amount sufficient to cover the cost of the Change Order.
 
 
 31
 3. All work performed under a Change Order shall be governed by the provisions of this Agreement.
 
 
 32
 The procedure utilized for disbursing the loan funds was as follows. Once HUD verified funds were available for a loan, it authorized the United States Treasurer to transmit a check for the loan amount to RLA payable to the loan applicant (owner) and to RLA as payees. The check was endorsed by the owner and RLA and deposited in the escrow account of RLA. After the contractor had performed the work required by the contract and by all approved written change orders, RLA paid the loan funds to the contractor for work done for the owner. No check was ever issued by the Treasurer payable to the contractor, as there was no privity of contract between the government and the contractor. Neither was the government a party to the contracts between appellant contractor and the owners. The government's sole responsibility was to advance the money to the owners and RLA once the loans were approved and the funds were available. The money thus disbursed was in the form of loans to the owners, which they were required to repay to the government, together with interest at the rate of 3% per annum.
 
 
 33
 The Court of Claims indicated in its order that there was a potential liability on the part of the government for extra work done by the contractor under a properly approved written change order if the funds were available. We interpret that part of the Court's order to mean that under such circumstances, the government would be required to advance the additional funds for the extra work to the owner and RLA as a part of the loan to the owner, but was not required to pay the money directly to the contractor, as there was no privity of contract between them. It should be pointed out that written change orders were never approved for extra work unless HUD certified to RLA that the additional funds were available, or unless the owner agreed to pay for the extra work with his own funds.
 
 
 34
 The Court of Claims ruled in its order in clear and unequivocal terms that the appellant can recover only for work performed under written change orders in compliance with Section 108.C, and only to the extent the funds were available. On remand, as shown above, the appellant admitted that he had been paid in full for all extra work done under written change orders. Therefore, appellant's claim for extra work done without an approved written change order in compliance with Section 108.C must be denied.
 
 
 35
 The appellant attempts to void the necessity of written change orders by saying that RLA furnished defective specifications which required it to do extra work, and that this defect created an implied contract between it and the government that imposed liability on the government for the extra work. It cites Anthony P. Miller, Inc., v. United States, 348 F.2d 475 (Ct.Cl.1965) in support of this argument. Its faith in that decision is misplaced, because in that case the defective specifications imposed liability on the government only because there was privity of contract between the contractor and the Air Force for which the contractor was building housing units. That case, and others of like import, are not relevant because there is no such privity of contract in the instant case.
 
 
 36
 The appellant contends further that it should recover for the extra work even though written change orders were not issued, because RLA was the agent for HUD and orally required it to perform the work. It argues that the activities of RLA as such agent in connection with the work on the housing units impliedly made the government a party to the contracts with resulting liability for the extra work. In this connection it points to the following acts, among others, of RLA in the administration of the contracts which it says created an implied contract between it and the government: inspection of property; preparation of a work-write up and cost estimate of the rehabilitation work; preparation of contract documents; obtaining bids and proposals; assisting homeowner in selection of contractor; issuing proceed order for construction work; inspection of rehabilitation work and issuance of progress payments; making final inspection of rehabilitation work; and issuance of final payment. We do not agree. These same contentions for the most part were made by a contractor in D.R. Smalley v. United States, 372 F.2d 505 (Ct.Cl.1967). In that case the government agreed to pay 90 per cent of the cost of building an interstate highway in the State of Ohio. The contract for building the road was between Ohio and the road contractor. The government was not a party to it. The contractor sustained a substantial loss in performing the work. It sued the United States to recoup its loss, contending that there was an implied contract between it and the government. To support this contention, it pointed out that: "the contracts were drafted pursuant to the regulations and requirements of defendant [the government]; the contracts were approved by defendant; the work was inspected and approved by defendant as it progressed; changes in plans were approved by defendant; the final completion of the work was inspected and approved by the defendant; and defendant agreed by the provisions of the law to pay the state (for the benefit of plaintiff) ninety per cent of the cost of the contracts. By reason of these claims, plaintiff asserts that it had express contracts with the defendant and in the alternative, the defendant was bound by implied contracts." In that case, the Court of Claims, in addition to holding that in making the grant the government was acting in its sovereign capacity, also held that the acts of the government enumerated above in supervising the contract did not create either an express or implied contract between it and the contractor. In this regard, the court stated:
 
 
 37
 The National Government makes many hundreds of grants each year to the various states, to municipalities, to schools and colleges and to other public organizations and agencies for many kinds of public works, including roads and highways. It requires the projects to be completed in accordance with certain standards before the proceeds of the grant will be paid. Otherwise the will of Congress would be thwarted and taxpayers' money would be wasted. See Mahler v. United States, 306 F.2d 713, 716-22 (3rd Cir.1962), cert. denied, 371 U.S. 923 [83 S.Ct. 290, 9 L.Ed.2d 231]. These grants are in reality gifts or gratuities. It would be farfetched indeed to impose liability on the Government for the acts and omissions of the parties who contract to build the projects, simply because it requires the work to meet certain standards and upon approval thereof reimburses the public agency for a part of the costs.
 
 
 38
 * * *
 
 
 39
 * * *
 
 
 40
 The contracts were between the state and plaintiff.
 
 
 41
 Accordingly, since there was no privity of contract, express or implied, between plaintiff and defendant, the defendant is not liable in contract for the damages claimed by plaintiff. 372 F.2d at 507, 508
 
 
 42
 In the instant case, as in Smalley, the government made grants of public money for a public purpose. The grants were in the form of very low interest rate loans to the owners of the properties involved for the purpose of upgrading the standard of housing in the neighborhood where the properties were located. Again, as in Smalley, the government was entitled to require the projects to be completed in accordance with certain standards before paying out the proceeds of the grants. To effectuate this requirement it appointed RLA as its supervisor and inspector.[4] In carrying out this assignment, the acts of RLA in supervising and inspecting the projects did not create an implied contract between the contractor and the government. Consequently, appellant's claim for recovery on that theory must be denied.
 
 
 43
 Finally, appellant asserts that it is entitled to a recovery from the government for extra work performed by it without an approved written change order because the government's agent, RLA, required the work to be done under circumstances amounting to economic duress. The alleged duress consisted of the following. In certain instances, the appellant says RLA ordered it to do extra work by promising "to issue" written change orders, but after the work was done RLA did not issue the change orders. In this connection, appellant misreads Section 108.C of its contract. That Section requires the contractor to prepare a change order and submit it to the owner. If acceptable to the owner, he signs it and either he or the contractor submits it to RLA "for approval." Therefore, it is clear that the RLA did not issue change orders but only approved them when submitted by the contractor or the owners, if all requirements had been met. The burden of initiating change orders was on the contractor and not on the RLA. Furthermore, appellant has not alleged nor proved that any change order proposed by it and agreed to by an owner was ever disapproved by RLA.
 
 
 44
 In further support of appellant's claim of economic duress, it says that in some instances RLA required it to do extra work without a written change order by threatening to withhold progress payments on work already done and approved, unless the extra work was done. It is apparent that if RLA made any such threats, it was acting outside the scope of its authority as the supervising and inspecting agent of the government. It is well settled that if an agent of the government acts outside the scope of the authority delegated to him his acts do not create any liability on the government. In fact, the Court of Claims so held in its order in the instant case, citing Federal Crop Insurance Corp. v. Merrill, 332 U.S. 380, 68 S.Ct. 1, 92 L.Ed. 10 (1947). Section 5(a) of the agreement between HUD and RLA provides that the failure of RLA to comply with the procedures and requirements of the Secretary with respect to loan approval, or with respect to other aspects of the Section 312 loan program "shall not create or justify any claim against the government on the part of any third person." We can assume that the appellant was well aware of this provision, because it is part of the agreement that appellant relies on to show that RLA was the agent of HUD. Consequently, appellant was on notice by this provision that no claim would be created in its favor against the government by the alleged unauthorized acts of RLA. We conclude that appellant's economic duress claims are without merit and they are rejected.
 
 
 45
 It is evident that appellant performed extra work on the projects without first having approved written change orders in its possession.[5] The Court of Claims held in its order, with which we agree, that under these circumstances the appellant cannot recover for such extra work. Accordingly, the order of the Claims Court dismissing appellant's complaint is affirmed.
 
 
 46
 AFFIRMED.
 
 
 47
 NIES, Circuit Judge, dissenting.
 
 
 48
 In my view the Claims Court has jurisdiction over appellant's claim for compensation for extra work resulting from specifications which were defectively prepared by RLA. I would, accordingly, remand for a trial on such claims. Such claims do not, in my view, require written change orders or fall within the limitation of available loan funds. I agree those requirements apply where the loan applicant makes changes thereby creating liability to the contractor for amounts over the contract price. However, it would be wholly inequitable to force a loan applicant to assume a liability greater than specified in the construction contract, where such increase resulted solely from the Government's mistakes in determining what needed to be done to meet minimum code requirements. I find the claims against the Government to be wholly independent of the borrower's obligations, and, thus, the provisions of Section 108.C, inter alia, are immaterial.
 
 
 49
 RLA was the agent of HUD by contract and, specifically, was authorized to prepare the construction contracts. Rehabilitation had to meet minimum code requirements for Government-backed financing. Having prepared the construction contract, RLA then solicited bids and selected or assisted the loan applicant in selecting a contractor. Such contractors had a right to have their bids fairly and honestly considered. Privity is, thus, established between appellant and the Government. Keco Industries, Inc. v. United States, 428 F.2d 1233 (Ct.Cl.1970). That implied-in-fact contract, in my view, includes a warranty by the Government that the specifications were adequate to make the property eligible for placement of the Government loan. To the extent that such warranty was breached, I would hold the Government liable. United States v. Spearin, 248 U.S. 132, 39 S.Ct. 59, 63 L.Ed. 166 (1918).
 
 
 50
 D.R. Smalley & Sons v. United States, 372 F.2d 505 (Ct.Cl.1967), is not contrary. In Smalley a contractor attempted to hold the Government liable for acts of the party with whom it had an express contract funded by the Government. Appellant here is not seeking to impute the wrongdoing of a property owner or tenant to the Government, but merely seeks to hold the Government responsible for its own acts.
 
 
 51
 Finally, I do not agree that the law of the case precludes reversal. The previous opinion of the Court of Claims specifically states that all arguments were to be considered on remand. Its direction that certain issues be addressed does not foreclose other issues. Since I read the trial judge's decision as holding that "the law of the case" limited the issues to be tried, I would remand for completion of the trial.
 
 
 
 [1]
 Section 2 provided that:
 "During the term of this Agreement, the Public Body shall have final authority to approve applications for Section 312 loans with respect to residential and mixed-use property, which will contain one to four dwelling units after rehabilitation, and which is located in an area with respect to which the Public Body has authority to process such loans, as described in Section 1 hereof. The Public Body shall exercise such loan approval authority with respect to property in all such areas which come under its jurisdiction during the term of this Agreement. However, no loan approval under authority of this agreement shall be valid until the Secretary has determined that funds are available therefor, and has notified the Public Body thereof."
 
 
 [2]
 Section 3 provided that:
 "Upon receipt of the documentation required by the Secretary's Regulations to be submitted with respect to Section 312 loans approved by a Public Body, the Secretary shall promptly notify the Public Body in writing whether sufficient funds are available for the approved loan."
 
 
 [3]
 We note plaintiff strenuously argues oral change orders can be approved in compliance with Section 108.C. We, however, find plaintiff's arguments unconvincing
 
 
 [4]
 In the contracts between appellant contractor and the property owners, the RLA was referred to as "escrowee" and "inspector."
 
 
 [5]
 Section 108.C prohibits the contractor from doing any extra work until he has received an approved written change order from RLA. Consequently, in doing such work without the change order, appellant violated the contract