**LOUISIANA DEPARTMENT OF HIGHWAYS**

v.

**The UNITED STATES.**

No. 129–76.

United States Court of Claims.

July 18, 1979.

William J. Doran, Jr., Baton Rouge, La., attorney of record, for plaintiff.

Richard J. Webber, Washington, D.C., with whom was Asst. Atty. Gen. Barbara Allen Babcock, Washington, D.C., for defendant.

Before DAVIS, KASHIWA and BENNETT, Judges.

## OPINION

### PER CURIAM:

This case comes before the court on plaintiff's exceptions to the recommended decision (opinion, findings, and conclusion of law) filed by Trial Judge Mastin G. White on October 20, 1978. Oral argument has been had, and the court has also considered the briefs and record. The court adopts the trial judge's findings and opinion, as supplemented and explained by the following paragraphs, as the basis for its judgment in the case.[1]

The provision governing the participation of the Federal Highway Administration in settlements by the state with Federal-aid contractors is paragraph 19 of. Policy and Procedure Manual 21–6.3, now 23 C.F.R. § 635.120 (1978).[2] The language particularly pertinent to this case is: "the extent to which such settlements are grounded in contract provisions and specifications and actual costs incurred." Though the wording is far from clear (and could and should be clarified) we understand this provision to mean that the Federal Highway Administration will refuse to participate if the contractor's claim is not reasonably, arguably, or colorably founded in some part of the contract or the specifications, fairly construed. Conversely, the regulation seems to mean that the Federal Government will not participate in a settlement of a contractor's claim which is wholly unmeritorious, insubstantial or frivolous. We take it be to be the deliberate policy of the Highway Administration to discourage the making and settlement of such worthless claims by let-

ting it be known in advance that it will not participate in a settlement—even though the Federal Government will be liable to share the costs of the litigation if the matter does go to trial. That policy choice is, of course, one for the Highway Administration to make.

In this case, we understand (though there is no explicit statement or finding) the trial judge to have found and concluded that the claim of the contractor (Southern Bridge Company) fell into this category of one not reasonably, arguably, or colorably grounded in any provision or specification of its agreement with plaintiff. We accept that conclusion. The trial judge then goes on to hold that, even on that foundation, the settlement between the contractor and the plaintiff was reasonable and in the public interest—but as we read it the standard of paragraph 19 of Policy and Procedure Manual 21–6.3 (note 2, *supra*) goes beyond mere "reasonableness" or the generality of the "public interest" to demand that in any event the contractor's claims have more substantiality and potential merit than the claim involved here.[3]

On this basis and on the trial judge's opinion and findings (as we understand them), the court concludes that plaintiff is not entitled to recover and that the petition must be dismissed.

## OPINION OF TRIAL JUDGE

WHITE, *Senior Trial Judge* : It is now necessary to consider the merits of this case, as earlier efforts by the defendant to

---

1. Though the court adopts the trial judge's findings, they are not printed herewith since his opinion and this *per curiam* opinion give the facts necessary for an understanding of the decision.

2. This provides as follows:

 The eligibility for, and extent of, Federal-aid participation in claim awards made by the State to Federal-aid contractors on the basis of arbitration board awards or State court judgments shall be determined on a case by case basis. Generally, the criteria for establishing Federal-aid participation in claims and resultant settlements is the extent to which such settlements are grounded in contract provisions

and specifications and actual costs incurred. Where legal issues arise in the course of resolving a claim, any data submitted for consideration shall include a brief from the legal counsel for the State setting forth the basis for determining the extent of the State's liability for the claims under local law.

3. Plaintiff can hardly complain that it misunderstood the federal policy on participation because it made no effort to discuss the settlement with the federal officials before it was consummated. It appears that the settlement would have been made even if federal participation had been refused in advance.

dispose of the litigation by means of a motion to dismiss and, subsequently, a motion for summary judgment were not successful, and a trial to ascertain the facts was then held in March 1978.

### Origin of Present Action

The case arose out of the construction during 1966–67 of a federal-aid highway project known as the Hearne Avenue Extension, in Caddo Parish, Louisiana. Before entering into a contract for the construction of the project, the Louisiana Department of Highways ("the Department") submitted to the defendant's Bureau of Public Roads (later the Federal Highway Administration) a proposal that the project be constructed as part of the national system of federal-aid highways, at an estimated cost of $1,557,-100. The proposal was reviewed and approved by the Bureau of Public Roads; and on May 27, 1966, the Bureau authorized the Department to proceed with the construction of the Hearne Avenue Extension. This action by the Bureau, under 23 U.S.C. § 106(a) (1976)—which is part of the Federal-Aid Highways Act, as codified and reenacted by Pub.L. 85–767, 72 Stat. 885, 892—created a contractual obligation on the part of the defendant to reimburse the Department for 50 percent of the costs incurred in constructing the project (*State of Arizona v. United States*, 494 F.2d 1285, 1287–88, 204 Ct.Cl. 171, 176–77 (1974)), provided the claim for reimbursement submitted by the Department was "grounded in contract provisions and specifications and actual costs incurred" (par. 19, Policy and Procedure Manual 21–6.3; now 23 C.F.R. § 635.120).

Before approving the Department's proposal, it was the responsibility of the Bureau of Public Roads to scrutinize the proposal, and its supporting documents, for the purpose of making sure that the estimated cost of the project met the standard of reasonableness (*see State Highway Commission of Missouri v. Volpe*, 479 F.2d 1099, 1113 (8th Cir. 1973)), and that federal participation would involve a proper and efficient use—and not a waste—of appropriated funds (*see Mahler v. United States*, 306 F.2d 713, 716 (3rd Cir. 1962), *cert. denied*, 371 U.S. 923, 83 S.Ct. 290, 9 L.Ed.2d 231 (1962)).

On July 18, 1966, the Department entered into a contract with Southern Bridge Company, of Dallas, Texas ("Southern Bridge"), for the construction of the Hearne Avenue Extension. The contract allowed Southern Bridge 175 days for the completion of the project, and provided that Southern Bridge was to receive $1,415,590.59 for the work.

The Department on July 25, 1966, ordered Southern Bridge to proceed with the work under the contract; work was started by Southern Bridge on July 29, 1966; and the 175-day period allowed for the completion of the work began to run on August 5, 1966.

It took Southern Bridge 292 days to complete the work on the Hearne Avenue Extension. The Department found 16 days of the 117 days of delay to be excusable; but, after seeking and obtaining the approval of the defendant's Bureau of Public Roads, the Department assessed against Southern Bridge liquidated damages for 101 days of delay at the rate of $280 per day prescribed in the contract, or a total of $28,280. Accordingly, the sum of $28,280 was withheld by the Department when it paid Southern Bridge for the performance of the work under the contract.

Southern Bridge subsequently filed suit against the Department in the United States District Court for the Eastern District of Louisiana, alleging that as a result of "gross misrepresentations and errors" in the contract plans and specifications, Southern Bridge incurred extra costs and liquidated damages in the sum of $256,941.37.

The litigation between Southern Bridge and the Department was ultimately settled by agreement of the parties on the basis of the Department paying Southern Bridge $28,280 (*i. e.*, the amount which the Department had withheld as liquidated damages), plus interest on such amount from the date of Southern Bridge's judicial demand on the Department. The settlement was reduced to the form of a consent judgment, which was signed by the district judge and entered in the district court on February 19,

1973. Pursuant to the settlement and the consent judgment, the Department paid Southern Bridge the previously withheld sum of $28,280, plus interest, or $32,506.

After settling the case with Southern Bridge, and paying the agreed amount to Southern Bridge, the Department submitted to the Federal Highway Administration (formerly the Bureau of Public Roads) a request for federal-aid participation in the settlement with Southern Bridge to the extent of $16,253 (i. e., 50 percent of the amount which the Department paid to Southern Bridge in accordance with the settlement and consent judgment). The Federal Highway Administration denied the Department's request for federal-aid participation; and the present action was then instituted by the Department.

### The Problem of the Bridge Piers

The litigation between Southern Bridge and the Department arose in connection with the construction of a bridge across a stream known as Twelve Mile Bayou, such construction being part of the work covered by the Hearne Avenue Extension contract. The bridge was to be supported by nine bents and by two piers. The piers, designated as pier # 1 and pier # 2, were to be installed at designated sites in the deeper parts of the water, and were to extend down below the surface of the water and into the bed of the stream.

The Department's design for the piers indicated that so-called "spread footings" were to be used as the bases of the piers, with the bottom of each footing being located at elevation 108 feet, mean sea level. (For the sake of convenience, "m. s. l." will be used hereafter in the opinion to mean "feet, mean sea level.") A spread footing consists of concrete, reinforced with steel. The concrete is poured in place and "in the dry" (i. e., on a dry surface).

In order to pour the concrete for the spread footings of piers # 1 and # 2 in the dry, it was necessary for Southern Bridge to erect a cofferdam around the site for each pier. The contract did not contain any specifications or drawings for the coffer-

dams. Hence, the choice of procedures, materials, and equipment for the construction of the cofferdams was left to the judgment of Southern Bridge.

A cofferdam for a bridge pier is made up of a large number of steel sheets, which have interlocks, one with the other, so that, as they are driven successively into the bed of the stream, one is locked watertight against another. The sheets are driven so that they surround the site for the pier. Once the cofferdam is properly in place, the soil inside the cofferdam may be excavated down to the prescribed elevation, the water removed from the cofferdam, and the concrete footing for the pier poured in the dry.

The steel sheets for a cofferdam are ordinarily driven with a pile-driving hammer. Sheetings of various weights and degrees of stiffness are available, and different sizes and weights of hammers are also available. The weight and stiffness of the sheeting, and the weight of the hammer, to be used on a particular job should be determined in relation to the nature of the soil into which the sheets are to be driven. Where driving conditions are difficult, a sheeting with greater stiffness and weight should be used, along with a heavier hammer.

When a cofferdam is excavated and dewatered down to the prescribed elevation, vertical pressures from the weight of the soil and water on the outside of the cofferdam push down against, and underneath, the tips (or bottoms) of the sheeting, and thus create upward pressure on the soil remaining within the cofferdam. If that soil is not sufficient in weight and in quality to withstand the pressure, there will be a "blow-in," with upheaval of the soil and, sometimes, displacement of the sheeting.

The contract plans for the Hearne Avenue Extension included data on core borings taken by the Department at the sites for piers # 1 and # 2. These data indicated that core samples of the soil had been taken from various elevations at each pier site, and the soil in each sample was classified as to, inter alia, soil type, consistency, moisture content, and plasticity index. In

this connection, it should be mentioned that one of the special provisions of the contract dealt with the subject of bridge borings, and stated as follows:

BRIDGE BORINGS: The borings for the development of subsoil information for bridge foundations, logs of which are included in the plans, were made by experienced operators. Soil samples will not be available for inspection, and bidders should make such additional investigations as they consider necessary to determine the subsoil conditions. No additional compensation other than contract prices on pay items will be allowed the contractor should it develop during construction that the subsoil materials is of a different character from that shown on the plans.

The various soil samples taken between elevations 120 and 90 m. s. l. at the site for pier # 1 were classified in the contract plans from the standpoint of soil type and consistency as, respectively: silty clay, and soft; sandy silt, and medium; silty loam, and hard; silty loam, and hard; silty loam and silty clay loam, and hard; silty clay loam, and very dense; and silty loam with clay lamination, and hard.

The soil samples taken between elevations 120 and 90 m. s. l. at the site for pier # 2 were classified in the contract plans from the standpoint of soil type and consistency as, respectively: silty clay, and medium; silty clay and silty loam, and soft; silty loam, and very dense; silty loam with clay lenses, and hard; silty loam, and very dense; and silty loam with clay lamination, and hard.

Southern Bridge submitted its plans for the cofferdams at the sites for piers # 1 and # 2 to the Department for approval. The plans indicated an intention to use MP 115 sheet piling for the cofferdams, and to drive the tips of the steel sheets down to approximately elevation 100 or 102 m. s. l.

Subsequent to the receipt of the plans for the cofferdams, the Department's project engineer wrote a letter to Southern Bridge, and stated in part as follows:

It should be noted .* * * that according to the borings near the pier location that hard driving conditions may be expected, and there is some question in my mind as to whether the MP 115 sheet piling will withstand the severe driving and remain locked and form a water tight seal.

 * * * * * *

This matter is being brought to your attention so you may check your design calculations and construction methods before you proceed with the MP 115 sheet piling.

Your plans for the cofferdam are not being disapproved but should they fail to achieve the results intended you will in no way be relieved from completing the project in accordance with the plans and specifications. * * *

In a supplemental letter that was written to Southern Bridge some three days later, the Department's project engineer stated (among other things) that "Should your proposed cofferdam not achieved the desired result, I will not consider this failure as a reason for an extension of contract time."

Despite the doubt expressed by the Department's project engineer as to whether MP 115 sheet piling was suitable for use in constructing the cofferdams at sites where the core borings showed that hard driving conditions were to be expected, and the warning that no extension of the contract time would be granted if delay resulted from the attempt to use the light sheet piling, Southern Bridge proceeded to use MP 115 sheet piling for the cofferdam at the site for pier # 1. Because of the comparatively light weight of the sheet piling the consistency of the soil at the site, Southern Bridge encountered so much difficulty in driving the steel sheets that the driving operations were discontinued when the tips of the sheets reached elevation 110 or 111 m. s. l., although Southern Bridge's plans had called for the tips of the sheets to be driven down to approximately elevation 100 or 102 m. s. l.

With the tips of the sheet piling which comprised the cofferdam at the site for pier # 1 standing at elevation 110 or 111 m. s. l., Southern Bridge commenced the excavation and dewatering process within the cofferdam. When the excavation reached elevation 114 m. s. l., a blow-in occurred. The soil remaining within the cofferdam broke into large pieces and thus permitted water to flow beneath the tips of the sheet piling and invade the interior of the cofferdam.

After the blow-in occurred, Southern Bridge resumed the effort to drive downward the sheet piling of the cofferdam at the site for pier # 1, and managed to drive the tips of the sheets down to elevation 102 m. s. l. Southern Bridge then attempted once more to excavate the soil within the cofferdam down to the required elevation of 108 m. s. l; and a second blow-in occurred.

After the second blow-in, Southern Bridge proposed to the Department that the design for pier # 1 be changed so as to eliminate the requirement for a spread footing, and to substitute a design under which: the tips of the cofferdam sheeting would remain at elevation 120 m. s. l.; additional excavation within the cofferdam would be accomplished down to elevation 107 m. s. l.; 55 steel bearing piles would be driven into the soil at the bottom of the excavation; a seal consisting of a special type of concrete (tremie) would then be poured "in the wet" into the excavation between elevations 107 and 111 m. s. l.; the interior of the cofferdam would be dewatered after the concrete seal hardened; and the pier footing would then be poured on the seal "in the dry."

Following negotiations between the Department and Southern Bridge, the Department agreed to accept Southern Bridge's proposed substitute design for pier # 1. Such acceptance, however, was conditioned upon certain stipulations, to which Southern Bridge agreed in a formal document which was designated as Change No. 8 and which stated in part as follows:

2. No additional contract time will be alloted [sic] in regard to the proposed design of Pier # 1.

\* \* \* \* \* \*

4. Total cost of change will be limited to materials above seal line, \* \* \* not to exceed plan quantities. (Note) Seal line shall mean the top of the seal course and bottom of footing at proposed elevation 111.00.

Southern Bridge thereafter proceeded to place the footing for pier # 1 in accordance with the substitute design proposed by Southern Bridge and approved by the Department subject to conditions. This method of placing the pier footing was more expensive than the placement of a spread footing in accordance with the original design would have been absent the blow-ins previously mentioned.

In constructing the cofferdam at the site for pier # 2, Southern Bridge used a type of sheet piling (Z–27) that was much heavier and five times stiffer than the MP 115 sheet piling which had been used for the pier # 1 cofferdam. Also, Southern Bridge used a heavier hammer to drive the sheet piling for the pier # 2 cofferdam than the hammer that had been used for the pier # 1 cofferdam. The use of these materials enabled Southern Bridge to drive the sheet piling for the pier # 2 cofferdam down to the planned elevation of 102 m. s. l., apparently without any great difficulty.

Instead of proceeding to excavate and dewater the interior of the cofferdam, however, Southern Bridge requested that the design for the footing of pier # 2 be changed in the same manner as had been proposed by Southern Bridge, and approved by the Department subject to conditions, with respect to the design for the pier # 1 footing. The Department approved Southern Bridge's request, subject to the same conditions which the Department had imposed in connection with the design change for the pier # 1 footing; and Southern Bridge and the Department entered into a formal document, Change No. 10, adopting the design change with respect to the pier # 2 footing and setting out conditions iden-

tical with those previously mentioned as having been included in Change No. 8.

The footing for pier # 2 was placed in accordance with the substitute design proposed by Southern Bridge and approved by the Department subject to conditions. This method of placing the pier footing was more expensive than the placement of a spread footing in accordance with the original design would have been assuming the absence of any blow-in.

As stated earlier, in the introductory part of this opinion, it took Southern Bridge 292 days to complete the work on the Hearne Avenue Extension; the Department, after requesting and obtaining the approval of the defendant's Bureau of Public Roads, assessed against Southern Bridge liquidated damages for 101 days of delay at the rate of $280 per day prescribed in the contract; and the Department withheld $28,280 from the contract price when it paid Southern Bridge for the performance of the work on the Hearne Avenue Extension.

A claim by Southern Bridge for additional compensation under the contract was denied administratively by the Department.

### Litigation Between Southern Bridge and the Department

The complaint which Southern Bridge filed against the Department in the United States District Court for the Eastern District of Louisiana, because of the delay and extra cost encountered in connection with the placement of the footings for piers # 1 and # 2, alleged (in pertinent part): that Southern Bridge relied on the soils data contained in the contract plans when estimating the cost of building piers # 1 and # 2, and submitted its bid for the contract on that basis; that as soon as Southern Bridge began driving the sheet piling for the cofferdam at the site for pier # 1, "it encountered an entirely different type of soil than that described by * * * [the Department], for instead of the soil being a material classified by * * * [the Department] as mostly 'loam' it was a material properly classified as a 'packsand', all of which made it most difficult and expensive

to drive the sheet piling and impossible to pump the water out of the cylinder because the inflow of the water through said packsand caused upheavals and blow-ins"; and that as a result "of these gross misrepresentations and errors in the * * * [plans] and specifications," Southern Bridge incurred extra costs and liquidated damages in the sum of $256,941.37.

The Department retained Charles William Roberts, a competent and experienced attorney of Baton Rouge, Louisiana, who had specialized in the conduct of litigation, to represent it in the case instituted by Southern Bridge.

Mr. Roberts first sought to have the case dismissed on jurisdictional grounds, but his motion to dismiss was denied by the district court.

After the denial of the motion to dismiss, Mr. Roberts undertook and carried out thorough and careful preparations for the trial of the case. As of the early part of February 1973, he was well prepared and ready to go to trial.

On the basis of his trial preparations, Mr. Roberts believed—and with good reason—that the Department would win the case. It was clear from the available evidence that the gist of Southern Bridge's complaint—i. e., that the soil at the sites for piers # 1 and 2 was "packsand," and that the references in the contract plans to soil in certain core samples as being "loam" constituted "gross misrepresentations," thereby causing Southern Bridge's difficulties—could not be sustained.

In the first place, the special provision of the contract on the subject of bridge borings notified Southern Bridge and other bidders that they should make any additional investigations that they might consider necessary to determine subsoil conditions, and warned them that contract prices would not be increased "should it develop during construction that the subsoil material is of a different character from that shown on the plans." Southern Bridge did not heed this notice and warning.

Moreover, the available evidence indicated that "packsand" was an obsolete term which had been used in the 1800's to describe certain sands in Texas, but which had not appeared in geological or soils engineering publications since about 1913. Although the term "loam," which the Department used to describe the soil in some of the core samples, may not have been a scientifically precise term (the use of "loam" as a soil description was later abandoned by the Department), the particular nomenclature—whether "packsand" or "loam"—was not a matter of great significance. The important thing was the actual *nature* of the soil at the sites for piers # 1 and # 2, as reflected in such factors as consistency, moisture content, and plasticity index. The available evidence indicated (and, Southern Bridge did not contend otherwise) that the data in the contract plans relative to such factors were basically accurate.

 It has been previously mentioned that the soils data in the contract plans showed that the consistency of the soil at the lower elevations into which Southern Bridge planned to drive the sheet piling was "hard" at some places and "very dense" at others. Also, the Department specifically called Southern Bridge's attention to the doubt which existed as to whether the light MP 115 sheet piling which Southern Bridge planned to use was suitable in view of the hard driving conditions that were to be expected on the basis of the core borings; and the Department expressly warned Southern Bridge that any difficulty experienced in using the light sheet piling would not be considered a proper basis for an extension of the contract time. Under the circumstances, therefore, it was negligent of Southern Bridge to use MP 115 sheet piling in constructing the cofferdam at the pier # 1 site, and Southern Bridge's difficulties resulted from such negligence.

Also, it should be mentioned that, ordinarily, at least the last 8 feet of the original soil in the bottom of a cofferdam should be left intact for safety purposes, and that to excavate any substantial part of the soil within the last 8-foot segment involves an unreasonable risk of a blow-in. Accordingly, Southern Bridge acted negligently in excavating the soil inside the cofferdam down to elevation 114 m. s. l. when the bottom of the cofferdam was located no lower than elevation 110 or 111 m. s. l., instead of the planned elevation of 100 or 102 m. s. l. It will be recalled that the first blow-in occurred when the excavation reached 114 m. s. l., which was only 3 or 4 feet above the bottom of the cofferdam.

The second blow-in was also attributable to negligence on the part of Southern Bridge, even though Southern Bridge had managed to drive the pile sheeting of the cofferdam down to elevation 102 m. s. l. before resuming the excavation of the soil inside the cofferdam. As an initial blow-in ordinarily has the effect of weakening the remaining soil structure in the vicinity of the bottom of a cofferdam, it was careless of Southern Bridge, after the first blow-in occurred, to attempt to excavate the soil inside the cofferdam down to the required elevation of 108 m. s. l., with the bottom of the cofferdam located no lower than 102 m. s. l. Under the existing circumstances, a second blow-in should reasonably have been anticipated by Southern Bridge.

 Furthermore, when Southern Bridge, after the two blow-ins previously mentioned, sought and obtained the Department's approval for changes in the pier designs so as to eliminate the requirement for spread footings, Southern Bridge expressly agreed that there would be no extension of the contract time and that the cost of the changes would be "limited to materials above seal line." By necessary implication, Southern Bridge thereby waived any claim for extra contract time or extra costs incident to the previous blow-ins and the placement of concrete seals to prevent any further blow-ins.

Thus, for the various reasons mentioned in this part of the opinion, Mr. Roberts was justified in his belief that the outcome of the litigation would be a judgment in favor of the Department and a dismissal of Southern Bridge's complaint.

*The Settlement Between Southern Bridge and the Department*

A pretrial conference in the litigation between Southern Bridge and the Department was scheduled to be held before the district judge on February 12, 1973. As the rules of the local district court required that the matter of a possible settlement be discussed at the pretrial conference, Mr. Roberts and the Department's staff attorney who was assigned to the litigation went to the office of the Department's Acting General Counsel on February 6, 1973, for the purpose of discussing the position that Mr. Roberts should take at the pretrial conference regarding a possible settlement of the Southern Bridge case.

Mr. Roberts informed the other conferees of his belief that the Department would win the case, but he also indicated that he was never 100 percent sure of winning any case.

As the Department's exposure (*i. e.*, the amount sued for) was in the neighborhood of a quarter of a million dollars, as it appeared that a trial would tie up numerous high-echelon employees of the Department for a period of from 3 to 5 days, and as a trial and possible appeal would involve additional costs to the Department, Mr. Roberts recommended that if the case could be settled on the basis of paying Southern Bridge the portion of the contract price that had been withheld from Southern Bridge as liquidated damages, the Department should agree to the settlement. The Department's staff attorney and Acting General Counsel concurred in this recommendation, and approval was also obtained from the Chief Engineer of the Department.

At the pretrial conference on February 12, 1973, the conferees discussed the possibility of settling the case on the basis of the Department paying Southern Bridge the portion of the contract price that had been withheld from Southern Bridge as liquidated damages. A question was raised by counsel for Southern Bridge as to whether the Department would pay interest on the money withheld. Mr. Roberts thereupon called the Department's Acting General Counsel on the telephone about the matter of interest; the Acting General Counsel conferred with the Department's Chief Engineer; and the Acting General Counsel then gave Mr. Roberts authority to agree to pay interest from the date of Southern Bridge's judicial demand. The attorney for Southern Bridge discussed the matter with his client; and Southern Bridge agreed to settle the case on the basis of receiving the amount withheld as liquidated damages, plus interest from the date of the judicial demand.

The agreement was thereupon reduced to the form of a judgment by consent, which was signed by the district judge and entered in the district court on February 19, 1973.

Pursuant to the settlement and the consent judgment, the Department paid Southern Bridge the sum of $32,506. It is one-half of this amount for which the Department is suing in the present case, on the ground that the defendant is contractually obligated to pay the amount sued for as part of the federal participation in the cost of constructing the Hearne Avenue Extension as a federal-aid highway project.

*Conclusion*

In view of the inconvenience and additional costs which the Department would have sustained in the event of a trial and a possible subsequent appeal, and in view of the circumstance that the Department got what it contracted for (*i. e.*, the construction of the Hearne Avenue Extension) and at the price which the Department originally contracted to pay (except that the public was deprived of the use of the particular highway segment for 101 days after the completion date provided for in the contract, and the Department had to pay the additional sum of $4,226 as interest on the money withheld from Southern Bridge), and in view of the public policy which favors the settlement of litigated cases where this can be done on a mutually satisfactory basis, thereby decreasing the burden on the judicial system, it is my opinion that the settlement of the case between Southern

Bridge.and the Department was reasonable and in the public interest.

■ It must be noted, however, that when the Department, with the approval of the defendant, properly assessed against Southern Bridge liquidated damages in the amount of $28,280 under the provisions of the contract, such action necessarily reduced the previously agreed contract price to the extent of $28,280 and thereby reduced the federal-aid participation figure, for which the defendant was contractually obligated, to the extent of one-half of $28,-280. Thereafter, when the Department, by means of the settlement, increased its own contractual obligation to Southern Bridge by the amount of $32,506, it did so without seeking or obtaining the approval of the defendant. Thus, the new contractual obligation of the Department to Southern Bridge, based upon the settlement, was not part of the "contract provisions and specifications" which the defendant had approved for the Hearne Avenue Extension as a federal-aid project.

Accordingly, it is concluded that the defendant is not contractually obligated under the Federal-Aid Highways Act, *supra*, to participate in the cost of the settlement.

It necessarily follows that the plaintiff is not entitled to recover in the present action, and that the petition should be dismissed.

### CONCLUSION OF LAW

Upon the findings and the trial judge's opinion, and on the court's *per curiam* opinion, the court concludes as a matter of law that the plaintiff is not entitled to recover and the petition is therefore dismissed.