COMMONWEALTH OF PENNSYLVA-
NIA, DEPARTMENT OF
TRANSPORTATION

v.

The UNITED STATES.

No. 429–75.

United States Court of Claims.

Feb. 25, 1981.

Robert H. Raymond, Jr., Harrisburg, Pa., attorney of record, for plaintiff. Robert W. Cunliffe and Edward G. Biester, Jr., Harrisburg, Pa., of counsel.

David M. Cohen, Washington, D. C., with whom was Asst. Atty. Gen. Alice Daniel, Washington, D. C., for defendant. Richard J. Webber, Washington, D. C., and Francis J. Locke, Baltimore, Md., of counsel.

Before NICHOLS, KASHIWA and SMITH, Judges.

## OPINION

KASHIWA, Judge:

This case comes before the court on defendant's exceptions to the recommended decision of Trial Judge Fletcher, filed September 27, 1979, pursuant to Rule 134(h). We must decide whether the trial judge was correct in concluding the federal government must contribute 90 percent of the actual settlement costs of two lawsuits arising from highway construction. After considering the written submissions of the parties and their oral presentations, we reject the trial judge's report and require 90 percent federal participation only to the extent expressed in this opinion.

Plaintiff Pennsylvania Department of Transportation (hereafter the State) has brought this suit alleging a breach by the United States (hereafter defendant) of an agreement requiring the United States to reimburse the State for 90 percent of the necessary costs of construction of Interstate Highway 84 in northeastern Pennsylvania. Neither party disputes that if reimbursement is owed, such reimbursement must, under the Federal-Aid Highways Act,[1] be at 90 percent of the allowable costs. The "costs" for which plaintiff seeks 90 percent reimbursement are unbudgeted amounts paid by the State to a utility (Milford Water Authority) and to the road construction contractor (Gasparini Excavating Company) in settlement of claims by those parties against the State.

In August 1967, several months after the excavation of the highway began, the utility complained to the Pennsylvania Department of Transportation that occasionally excessive amounts of particulate matter had begun to appear in its reservoirs, clouding the water. This clouded, or turbid, water was aesthetically displeasing and had

---

1. The statutory framework, now codified at 23 U.S.C. §§ 101 *et seq.* (1976), was first enacted in 1916 as the Federal-Aid Road Act of 1916, ch. 241, 39 Stat. 355. Although numerous successive road acts have altered minor details of the scheme, the 1916 framework of state expenditure with federal reimbursement has remained intact. For simplicity's sake, we refer hereafter to the statutory framework as if it were contained in a single act of Congress.

an unpleasant taste. As some of the watersheds which fed the Milford reservoirs were located within the construction area, Milford felt the turbidity problem was caused by the exposure of bare slopes during highway construction.

The Department of Transportation engaged an engineering firm, Michael Baker, Jr. Inc., to study the relationship between the turbidity and highway construction. If the engineers found the turbidity and construction related, they were to propose solutions to the problem. The Baker engineering firm subcontracted the consulting report, so the actual engineering study was done by Gannett, Fleming, Corddry and Carpenter, Inc. (hereafter Gannett). Gannett monitored the turbidity from March 1967 through September 1968. Neither party disputes Gannett's expertise as engineers, nor the manner in which the study was conducted.

While Gannett was conducting the study, Milford filed a lawsuit on December 27, 1967, in a Pennsylvania state court seeking drainage revisions, monetary damages, construction of a filtration system, and other relief as the court should deem appropriate. Resolution of this lawsuit was apparently stayed while the Gannett study was being completed.

The Gannett study was issued on October 31, 1968. The Abstract of the Report adequately summarizes the conclusions and recommendations of the consulting engineers:

\* \* \* \* \* \*

The source of the turbidity is the excavation for Interstate Route 84, L.R. 1049, which is being constructed approximately one-half mile north of the Milford water supply reservoirs. The primary source is the cut slopes of the highway excavation between Vantine Brook and Vandermark Creek. After heavy rains, turbid runoff water from this area enters Vantine Brook and then infiltrates to the ground water body which feeds the Milford water supply reservoirs. \* \* \*

The turbidity problem can be significantly reduced by transporting all drainage from the highway slopes east of Vantine Brook to Vandermark Creek, by stabilizing these same highway slopes with seed and mulch or other means, and by reducing the velocity and thereby the erosion tendency of water discharged to Vantine Brook. *The combined use of these measures would effect a significant reduction in the turbidity within two years. After this initial reduction it is expected that operating procedures at the Milford water supply can provide water of acceptable quality.* [Emphasis supplied.]

*Should the measures described above prove to be insufficient, the paving of infiltration zones along Vantine Brook or the construction of a clear water holding reservoir are feasible alternative solutions.* The project costs for a one million gallon steel holding reservoir would be about $100,000; the total cost for channel lining cannot be determined without additional knowledge of the extent of the zones of infiltration along Vantine Brook. The construction of a holding reservoir would represent a permanent improvement to the Milford supply. [Emphasis supplied.]

Thus, the primary recommendation of the Report was to redesign the area's drainage system and to rapidly replant the exposed slopes. This solution was the least expensive, with an estimated cost of $58,000, and was likely to provide an acceptable cure to the problem. More expensive measures, such as a one million gallon holding reservoir, costing $100,000, or a complete water treatment facility, costing $750,000, would not be necessary *unless* the drainage revisions and the replantings did not cure the problem. The record indicates the State did design a revised drainage system costing $58,000, but the revisions were never made.

Copies of the Report were given to Federal Highway Administration (FHWA) officials on November 6, 1978. Thereafter, State officials met with counsel for Milford in an effort to end the lawsuit. Staff members of the FHWA attended some of the meetings as observers but did not participate. The State agreed to finance the con-

struction of a 1.5 million gallon steel reservoir and to provide a five-year water-quality surveillance program.[2] The reservoir was not built.[3] Instead, by supplemental agreement, the State agreed to pay Milford $275,000 to release all claims against the State.

The State paid the money to Milford and submitted a formal request to the FHWA for reimbursement of the settlement cost as a construction expense under Project I–84–1(19)46. The FHWA denied federal participation on August 7, 1970. Thereafter, the State resubmitted the denied settlement costs as a right-of-way expense under Project I–84–1(12)46. Apparently not realizing the costs were being dealt, with as construction expenses and had already been denied, the right-of-way personnel allowed the settlement costs under the right-of-way project. When the mistake was discovered, the FHWA recovered the $275,000 by means of a setoff against moneys owed Pennsylvania under other projects. Eventually, this suit followed.

Simultaneous with the events involving the Milford Water Authority, a related dispute arose between the Pennsylvania Department of Highways and its construction contractor, Gasparini. By letter of December 20, 1967, Gasparini requested the State's approval of a borrow site[4] known as the Olmstead site, beginning in spring 1968.[5] This was Gasparini's first formal request to use this particular site, although apparently other grading and borrow operations had occurred in 1967. The contract specifications required the State to approve any borrow site adjacent to the highway or likely to cause pollution of waterways. The Olmstead site was adjacent both to the highway and, unfortunately, to Vantine Brook, a feeder stream into the utility's

reservoirs. Fearful that borrow operations at the site would exacerbate the turbidity problem, the State indicated it would approve the site only if Milford also agreed to the borrow site. Gasparini sought, but did not receive, Milford approval. Nevertheless, throughout early 1968 the State encouraged Gasparini to continue to try to gain Milford approval of the Olmstead site rather than to direct the contractor to obtain fill elsewhere. The State finally formally directed Gasparini to use alternate borrow sites on August 12, 1968. Had the State directed the use of alternate borrow sites by April 1, 1968, additional costs of approximately $90,000 above the contract price for borrow would have been incurred.

By letter of August 20, 1968, Gasparini gave written notice of its intention to assert a claim for delay based on the borrow dispute. On February 20, 1970, Gasparini submitted a delay (and related expenses) claim of $2.3 million. The $2.3 million claim represented the contractor's total costs for the entire grading and borrow portions of the project, net of payments previously received, plus a $225,000 profit. The contractor computed his costs not on actual expenditures but, instead, by using artificial hourly rental ("force account") rates. By use of the force account rates, Gasparini's equipment charges were 300 percent of actual equipment costs.

State highway officials met with Gasparini to resolve the claim in March and April 1970. As with the Milford negotiations, FHWA staff members attended the meetings as observers but did not participate. At the April meeting, Gasparini offered to withdraw its $2.3 million claim if the State would pay $846,778, which Gasparini alleged represented its actual costs for the entire grading and borrow portions of the

2.  The 1.5 million gallon reservoir was 500,000 gallons in excess of that which the consulting engineers recommended as an alternative if the drainage revisions and replantings proved unsuccessful. The record offers no explanation why the State agreed to construct a reservoir 50 percent greater than that thought necessary by the consultants it hired.

3.  The turbidity problem cured itself. The water today is of acceptable quality.

4.  A borrow site is where fill material for grading operations is excavated.

5.  Borrow and fill operations generally cannot be conducted during winter months in northern climates, as the frozen materials will not pack properly.

project, plus a profit of $144,000. This proposal did not use the force account rates to compute equipment costs. The State tentatively accepted the settlement at the meeting and finalized the settlement by letter later that month. Gasparini was subsequently paid $835,612, of which 90 percent reimbursement is demanded from the United States.

We begin by observing that these settlement costs exceed the original Project Agreement cost limitations. Although neither party has cited authority which requires reimbursement of these unforeseen costs, the defendant concedes it has a policy of reimbursing unbudgeted settlement costs.[6] On brief, no doubt based on this policy, the defendant assumes that reimbursement of reasonable settlement costs is required (presumably under the original Project Agreement) and, instead, addresses itself to the question of to what extent these settlements were reasonable. There is nothing in this record which causes us to reject defendant's understanding of its obligations. The majority therefore cannot agree with the suggestion in the concurring and dissenting opinion that reimbursement can only be required where a separate formal request has been made prior to settlement. On these facts, the defendant's view that it is required to reimburse reasonable settlement costs under the Project Agreement is sufficient.

Defendant's decision to *limit* its reimbursement obligation to only reasonable settlement costs, we think, necessarily follows from the statutory scheme (and its legislative history) establishing the federal highway aid program. From that scheme,

> * * * it is clear that Congress did contemplate that the Secretary exercise administrative expertise to see that apportioned funds are not expended on projects which fail to meet reasonable standards of cost.
>
> *    *    *    *    *    *
>
> The Congressional intent is that the Secretary may exercise his discretion to insure that the roads are well constructed and safely built at the lowest possible cost, all in furtherance of the Act * * *.

*State Highway Commission of Missouri v. Volpe*, 479 F.2d 1099, 1113–1114 (8th Cir. 1973); *see Mahler v. United States*, 306 F.2d 713, 718–719 (3d Cir.), *cert. denied*, 371 U.S. 923, 83 S.Ct. 290, 9 L.Ed.2d 231 (1962). *See also Citizens Organized to Defend Environment, Inc. v. Volpe*, 353 F.Supp. 520, 531 (S.D.Ohio 1972).

A rule requiring federal participation regardless of reasonableness might well be imprudent where the state disbursing the moneys bears only a small fraction of the true costs. Applying a rule of reasonableness to unforeseen costs in cases under the Act is consistent with the more general rule requiring that a government contractor must proceed reasonably in order to recover expenses beyond the limitations contained in a cost-reimbursement contract. *E. g., Singer-General Precision, Inc. v. United States*, 192 Ct.Cl. 435, 427 F.2d 1187, 1192 (1970). We find the defendant's requirement, that unbudgeted settlement costs are reimbursable only if reasonable, to be proper. Indeed the State does not seriously dispute that only reasonable settlement costs are eligible for federal participation.

Nor does the State dispute the well-established rule in this court that a "government contractor bears the 'burden of establishing the fundamental facts of liability, causation and resultant injury.'" *Electronic and Mis-*

---

**6.** The court's own research discloses that the FHWA had issued at least one formulation of this policy prior to the date of this Project Agreement, Paragraph 19 of Policy and Procedure Manual 21–6.3 (now 23 C.F.R. § 635.120 (1980)). That paragraph seemingly became a part of this Agreement under a clause incorporating "regulations[,] * * * policies and procedures * * *" of the FHWA even though the paragraph was not then formally a regulation.

*See People of the State of California v. United States*, 213 Ct.Cl. 329, 338, 551 F.2d 843, 848, *cert. denied*, 434 U.S. 857, 98 S.Ct. 180, 54 L.Ed.2d 130 (1977); *People of the State of California v. United States*, 547 F.2d 1388, 1390 (9th Cir.), *cert. denied*, 434 U.S. 824, 98 S.Ct. 70, 54 L.Ed.2d 81 (1977). Neither party, however, has argued that Paragraph 19 applies to these settlements. Accordingly, we rest our decision on other grounds.

*sile Facilities, Inc. v. United States,* 189 Ct.Cl. 237, 253, 416 F.2d 1345, 1355 (1969), citing *Wunderlich Contracting Co. v. United States,* 173 Ct.Cl. 180, 199, 351 F.2d 956, 968 (1965); *Roberts v. United States,* 174 Ct.Cl. 940, 956, 357 F.2d 938, 949 (1966). *See also Huerta v. United States,* 212 Ct.Cl. 473, 548 F.2d 343 (1977).

Instead, the State argues as an initial matter that under the Federal-Aid Highways Act actual, or historic, costs are presumed to be reasonable. This alleged presumption, the State continues, shifts the ultimate burden of proof from it as a contractor, *see Electronic and Missile Facilities, supra,* to the defendant. Thus, once actual costs are shown in a suit under the Act, the State concludes, reimbursement must be made unless the *defendant* proves the actual costs are unreasonable. Following this reasoning, the trial judge below concluded that the defendant failed in its burden and that reimbursement was appropriate in the full amount sought by plaintiff.

We assume, *arguendo,* that a presumption for reimbursement does arise under the Federal-Aid Highways Act once actual payment by a state is shown. *Cf. Bruce Construction Corp. v. United States,* 163 Ct.Cl. 97, 102, 324 F.2d 516, 519 (1963) (in general equitable adjustment actions, "historical" costs are presumed reasonable). In modern federal civil practice, Federal Rule of Evidence 301 controls the effect of presumptions. It provides:

Rule 301.
PRESUMPTIONS IN GENERAL IN CIVIL ACTIONS AND PROCEEDINGS

In all civil actions and proceedings not otherwise provided for by Act of Congress or by these rules, a presumption imposes on the party against whom it is directed the burden of going forward with evidence to rebut or meet the presumption, *but does not shift to such party the burden of proof in the sense of the risk of nonpersuasion, which remains throughout the trial upon the party on whom it was originally cast.* [Emphasis supplied.]

Thus, unless Congress has otherwise required the ultimate burden of proof in cases under the Act to shift to the Government, F.R.E. 301 requires the ultimate burden to remain with the State here, the presumption notwithstanding.

Nowhere in the Federal-Aid Highways Act is there an express requirement that the ultimate burden must shift once actual costs are shown. Moreover, although the language of a statute might implicitly require such a result, *cf., e. g., Griggs v. Duke Power Co.,* 401 U.S. 424, 432, 91 S.Ct. 849, 854, 28 L.Ed.2d 158 (1971) (intent of Title VII is to shift burden to employer to disprove discrimination); *Albemarle Paper Co. v. Moody,* 422 U.S. 405, 425, 95 S.Ct. 2362, 2375, 45 L.Ed.2d 280 (1975) (same), our review of the relevant legislative history surrounding the initial passage of the Act in 1916 convinces us that Congress was concerned that imprudent state action might drain the federal treasury. *E. g.,* H.Rep. No.26, 64th Cong., 1st Sess. 4–5 (1916); S.Rep.No.250, 64th Cong., 1st Sess. 15–6 (1916). *See generally Mahler v. United States,* 306 F.2d at 719–722. That concern seems inconsistent with a conclusion that Congress intended the FHWA to affirmatively disprove the reasonableness of state disbursals exceeding project spending limitations. Also, we are not unmindful that under the legislative scheme, the various states actually disburse the money and then seek reimbursement from the FHWA. Thus, a state seems far better able to prove the reasonableness of an expenditure than is the FHWA to disprove the reasonableness of the expenditure. For these and other reasons, no previous federal appellate decision has shifted the ultimate burden in an FHWA case to the Government. *See, e. g., People of the State of California v. United States,* 213 Ct.Cl. 329, 551 F.2d 843; *Louisiana Department of Highways v. United States,* 221 Ct.Cl. ——, 604 F.2d 1339 (1979); *Mahler v. United States, supra; State Highway Commission of Missouri v. Volpe, supra; People of the State of California v. United States,* 547 F.2d 1388. *See also Massachusetts v. Connor,* 248 F.Supp. 656 (D.Mass.1966). We see no reason to

reach a different result today merely because the State wishes it so.

█ Therefore, since Congress has not otherwise provided, F.R.E. 301 precludes the shifting of the ultimate burden from the State of Pennsylvania to the defendant. Since the defendant met the presumption by offering evidence that the settlement costs were unreasonable, we now turn to each settlement to determine its reasonableness.

█ · We begin by rejecting the defendant's argument that neither the Milford nor the Gasparini settlements could be reasonable because both disputes stemmed from the State's negligence in design of the highway. We are hesitant to adopt such a broad rule, especially where the FHWA must itself approve highway design prior to any construction. On these facts, however, we need not reach the absolute rule for which the defendant contends. The trial judge below found, and we concur, that these facts are insufficient to establish design negligence by the State. Similarly, we reject the State's initial argument that estoppel lies against the defendant to deny either claim. Nothing in this record convinces us the Government misled the State. Moreover, the thrust of the State's argument, that *Arizona Highway Department v. United States*, 204 Ct.Cl. 171, 494 F.2d 1285 (1974), somehow limits the Government's right to recover the erroneous payments of the Milford claim, is incorrect as a matter of law. The United States has inherent authority to recover sums erroneously paid, and it cannot be estopped from doing so by the mistakes of its officers or agents. *Aetna Casualty & Surety Co. v. United States*, 208 Ct.Cl. 515, 520, 526 F.2d 1127, 1130 (1976), and citations contained therein.

With these initial comments, we turn to the central matter, whether these settlement payments were reasonable.

### Milford Settlement

In arguing that its settlement for $275,000 with the water utility was reasonable, the State stresses both that the Milford lawsuit posed an enormous potential liability and that the drainage revisions its own consultants recommended were not guaranteed to solve the turbidity problem. Since the settlement ended all potential exposure, the State concludes, the settlement was *a fortiori* reasonable. For its part, the defendant asserts that the drainage revisions and replantings recommended by Gannett if implemented would have controlled the turbidity at a much lower cost. Thus, the defendant says, any settlement cost in excess of $58,000, the amount the State concedes the revisions and replantings would have cost, was unnecessary and hence unreasonable.[7]

The true liability that a lawsuit poses is rarely susceptible of precise quantification prior to final judgment. Both parties in litigation may encounter unforeseen difficulties of proof. The skill of opposing counsel and the resources each side can devote to the conflict may be additional unknowns. Moreover, no party can be precisely certain of the interpretation the trier of fact will give to either the facts or the law. All of these factors are difficult to quantify and even though free to recognize frivolous claims, we have been reluctant to second-guess the decisions of litigating parties and their counsel with respect to settlements involving claims of at least some merit. *Louisiana Department of Highways*, 221 Ct.Cl. at ——, 604 F.2d at 1347–1348. Our reluctance to sit as a local court on the merits of the Milford claim, however, does not insulate the eventual settlement from all scrutiny to determine reasonableness when federal participation is sought. Thus, the fact that these sums were expended to settle litigation is to be considered, but in no sense is decisive on the issue of their reasonableness.

---

7. The Government also argues that under Policy and Procedure Memorandum 30–4, which is applicable to this project, any settlement costs which exceed the cost of the drainage revisions and replantings constitute a betterment to the utility and are ineligible for federal participa-

tion. Under our holding, we need not reach this contention regarding Policy and Procedure Memorandum 30–4. Moreover, we note the argument also turns on a determination of whether the revisions and replantings were the reasonable solution to the turbidity problem.

In *Louisiana Department of Highways, supra*, the State of Louisiana had settled a claim with little, if any, merit. Under Paragraph 19 of Policy and Procedure Manual 21–6.3, which had been incorporated into Louisiana's Project Agreement, reimbursement would only be made of settlement costs which were "grounded in contract provisions and specifications and actual costs incurred." In construing this language, we wrote:

> * * * The language particularly particularly pertinent to this case is: "the extent to which such settlements are grounded in contract provisions and specifications and actual costs incurred." Though the wording is far from clear (and could and should be clarified) we understand this provision to mean that the Federal Highway Administration will refuse to participate if the contractor's claim is not reasonably, arguably, or colorably founded in some part of the contract or the specifications, fairly construed. Conversely, the regulation seems to mean that the Federal Government will not participate in a settlement of a contractor's claim which is wholly unmeritorious, insubstantial or frivolous. We take it to be the deliberate policy of the Highway Administration to discourage the making and settlement of such worthless claims by letting it be known in advance that it will not participate in a settlement—even though the Federal Government will be liable to share the costs of the litigation if the matter does go to trial. That policy choice is, of course, one for the Highway Administration to make. [221 Ct.Cl. at ——, 604 F.2d at 1340.]

With that as a predicate, we concluded that, even if Louisiana's settlement with the contractor was assumed to be reasonable in a general sense when considering a policy favoring settlement of litigation, the standard expressed in Policy and Procedure Manual 21–6.3 demanded that "[a] contractor's claims have more substantiality and potential merit than the claim involved [there]." *Id.* We think similar considerations are applicable here. At a minimum, a claim against a state must have some basic merit to be considered for reimbursement as "reasonable." But the mere fact that a claim against a state may have some legal merit does not mean any possible settlement of the claim is reasonable. We must also look to whether the settlement, as made, appears to be reasonable on all of the facts available to a state at the time of settlement. We have, in other circumstances, characterized the duty of reasonableness in several ways, but the essence of the term is that a party must proceed prudently, wisely, and efficiently. *See H & H Manufacturing Co. v. United States*, 168 Ct.Cl. 873, 884–885 (1964); *Bruce Construction Corp. v. United States*, 163 Ct.Cl. at 100–101, 324 F.2d at 518–519; *Nager Electric Co. v. United States*, 194 Ct.Cl. 835, 852–853, 442 F.2d 936, 945–946 (1971). The settlement is reasonable only to the extent it would have been made "by a prudent businessman placed in a similar" position. *Nager Electric Co.*, 194 Ct.Cl. at 852, 442 F.2d at 945. *See Bruce Construction Corp.*, 163 Ct.Cl. at 100–101, 324 F.2d at 518–519.

Here, the Milford settlement for $275,000 was unreasonable in light of the alternative action the State might have taken to end its potential liability. As its own consultants' Report demonstrated, the Milford turbidity problem was likely to have been cured had the State implemented the drainage revisions and replantings costing $58,000 that it designed following the Report. While the State is correct that the engineers did not guarantee this solution, we think the State requires too much.

It is clear from the Report that the engineers concluded the drainage revisions and replantings would provide an acceptable and workable solution to the turbidity problem:

### XII CONCLUSIONS

* * * * * *

(11) The careful construction [of the drainage modifications] * * * should result in the gradual reduction of the turbidity problem at the Milford reservoirs.

*They represent the fastest and most practical solution. It is expected that by following * * * [this recommendation] the problem can be reduced sufficiently in about two years to the point where operating procedures. at the reservoirs can adequately handle the problem. As the slopes of the highway stabilize, the turbidity problem should gradually reduce and, after five years, be minimal. [Emphasis supplied.]*

Further, it is clear that Gannett recommended the drainage revisions and replantings as the most reasonable and economic solution to the problem. In the Report, Gannett exhaustively analyzed the sources of the problem, proposed solutions and evaluated the effectiveness of each solution, and then compared the various alternatives on a cost-effective basis. Gannett's recommendation, based upon the 18-month study, was that the drainage revisions and re-plantings should be implemented and only if the replantings and revisions failed to control the problem would it be necessary to explore other more costly alternatives. After reviewing this record, we conclude implementation of the drainage revisions and replantings afforded the State an opportunity to resolve the Milford litigation at a far lower cost than the eventual cash settlement the State chose. We find a private businessman in such a position would have chosen to implement the drainage revisions and replantings to end the litigation. We require no less prudence from the State as a public businessman.

Therefore, we conclude that implementation of the drainage revisions and replantings at a cost of $58,000 provided the reasonable solution to the Milford litigation. We hold that defendant must participate only to the extent of 90 percent of $58,000, or $52,200, in the Milford settlement.

### Gasparini Claim

To justify its Gasparini settlement, the State argues that it faced a potential liability of $2.3 million for Gasparini's excess borrow costs when the State formally required the use of an alternate borrow site on August 12, 1968. The defendant coun-

ters by asserting either that the State had an unqualified contract right to reject the Olmstead site without liability for excess costs or, alternatively, if liability existed, that the State unreasonably failed to mitigate the excess costs when it delayed until August 12, 1968, in requiring an alternate site.

Both parties have pled and argued Pennsylvania law in support of their respective positions on whether the State would have been found liable had Gasparini prosecuted its claim. After considering the arguments of each, we conclude the State has met the threshold test we have established for settlement costs to be reasonable, *i. e.*, there was at least some merit to the Gasparini claim. *See Commonwealth, G.S.A. v. Loffredo*, 16 Pa.Cmwlth. 237, 328 A.2d 886 (1974). *See also Carbon Construction Co. v. Commonwealth, Department of Transportation*, Bd. of Arbitration # 476 (decision of September 30, 1976). *But see Central Penn Industries, Inc. v. Commonwealth of Pennsylvania, Department of Transportation*, 25 Pa.Cmwlth. 25, 358 A.2d 445 (1976). We have considerable doubt, however, that Gasparini's settlement proposals accurately reflected the excess costs incurred solely because of the alternate site requirement. We leave to another day whether erroneous assumptions concerning the true date of breach, the proper allocation of costs to the post-breach period, and the profitability of the contractor may themselves render a settlement unreasonable. *See, e. g., Boyajian v. United States*, 191 Ct.Cl. 233, 239–240, 245–254, 423 F.2d. 1231, 1235, 1238–1244 (1970), and cases cited therein.

■ As we have already discussed with regard to the Milford settlement, the State must demonstrate that it proceeded reasonably in settling the Gasparini litigation. Reasonableness requires, we think, not only that the State explore and adopt less expensive alternative means of terminating the lawsuit other than by outright cash settlement but, also, that the State proceed in a manner so that its potential liability on claims is kept to a minimum.

This record indicates that the State did not formally request Gasparini to use an alternate site until August 12, 1968, and in fact *encouraged* Gasparini throughout early 1968 to continue to seek approval (however unlikely) of the Olmstead site from Milford. This Gasparini did from December 1967 through August 1968. Milford, during this time, had already sued the State over the turbidity. The State's hope that Milford might gratuitously approve the Olmstead site and its potential for increased turbidity seems unfounded in light of Milford's observable willingness to protect its water supply. More prudently, the State at some point prior to the scheduled start of spring 1968 borrow operations should have concluded that no such approval would be forthcoming from Milford and that another borrow site would have to be used. Had the State acted, it could have avoided delay. The State was well aware that any delay in the start of the spring 1968 borrow operations would greatly increase the excess costs associated with an alternate site. Prudence dictated that the State make a timely decision so that delay could be avoided and any excess costs kept to a minimum. This the State failed to do. Had the State acted in a timely manner, the record is clear that Gasparini's excess borrow costs would have been significantly lower than the $846,000 the contractor claimed as a result of delay until August. The trial judge found, and we concur, that had the State required an alternate borrow site on April 1, 1968, Gasparini would have incurred additional costs of approximately $90,000. The failure of the State to give such timely direction was unreasonable. *Cf. Astro-Space Laboratories, Inc. v. United States*, 200 Ct.Cl. 282, 308–309, 470 F.2d 1003, 1018 (1972) (reprocurement must occur in a timely manner after default and mitigation of damages to be reasonable).

Therefore, we conclude that the reasonable solution to the borrow site controversy was for the State to direct the contractor by the start of spring 1968 borrow operations to obtain borrow elsewhere. Had the State done this, the contractor's excess borrow costs would have been limited to $90,-000. We hold that defendant must participate only to the extent of 90 percent of $90,000, or $81,000, in the Gasparini settlement.

Based on the foregoing, we conclude federal participation in these settlements is required to the extent of $52,200 plus $81,-000 or $133,200. Judgment of $133,200 is entered for plaintiff.

NICHOLS, Judge, concurring and dissenting:

I agree with the holding of the panel insofar as it reduces the award from $999,-551.20 to $133,200, but, respectfully, I would go further and dismiss the petition.

The FHWA contract with the State specified an amount and stated as follows: "[f]ederal funds are obligated for the project not to exceed the amount shown herein." The contract and relevant regulation on the pertinent date are silent as to what happens in case of unbudgeted claims, breaking the ceiling if allowed. I think, in such circumstances, certain requirements are implied, or are to be met by reformation to effect the real agreement of the parties. They are, if the State wishes to pay the claims and be reimbursed, it should obtain FHWA approval in advance. It is not sufficient to inform the FHWA officials to attend the settlement negotiations as observers. The State should have insisted on prompt decisions. In argument before us, State counsel said they were fearful of an injunction suit (in the case of the Milford claim) and were aware by past experience how dilatory the FHWA would probably be in passing on requests for unbudgeted funds. I do not consider this excuse adequate. If defendant had failed to rule promptly on explicit reimbursement requests, thereby delaying the project and increasing the cost, it would have been liable in breach damages for failing in its "implied duty of cooperation and noninterference which is inherent in any contract." *S. A. Healy Co. v. United States*, 216 Ct.Cl. 172, 188, 576 F.2d 299, 306 (1978), and cases cited. But an implied burden on defendant to make a ruling promptly does not arise until it has a request for one before it.

I do not read *Louisiana Department of Highways v. United States*, 221 Ct.Cl. ——, 604 F.2d 1339 (1979) as the panel does. The opinion of Senior Trial Judge White, which the court adopts as its own, seems to me to hold in the concluding portion that the settlement there involved was "reasonable and in the public interest" but reimbursement was not allowable because not given approval by defendant before being paid. The court in its preliminary per curiam remarks construes the White opinion to view the settlement as prudent to make but not reimbursable because not "grounded in contract provisions and specifications and actual costs incurred," a standard stated in a regulation not argued to be applicable here. Apparently the regulation was meant to require disallowance of claim settlements even if prudent and reasonable, if the claim does not meet some objective criteria. But the court did not disavow the alternative ground stated in the White opinion and I think it is correct. Defendant did acknowledge that the FHWA has consistently contributed to additional (unbudgeted) costs (it deemed) reasonably incurred. That it has commendably waived the contract cost ceiling when persuaded the claim was reasonable, does not mean it waives it when not so persuaded. Nor do I think it can be estopped into a waiver by inaction (laches) of its representatives. *Costello v. United States*, 365 U.S. 265, 281, 81 S.Ct. 534, 542, 5 L.Ed.2d 551 (1961).

It appears to me plaintiff is seeking equitable relief, whether we deem it reformation of the basic contract or enforcement of clauses added to it by implication. Where any obligation it incurs is supposedly to be reimbursed by the United States up to as much as 90 percent, it owes the United States a strong obligation in equity, first, to protect the interests of the United States, and second, to give it every opportunity to protect its own interests. It did not do the first, as we find, in the portions of the opinion I join in, that the settlements were grossly excessive. It did not do the second: instead of misconstruing the silence and nonfeasance of dilatory FHWA representatives, it should have demanded a decision in a manner to reach the attention of FHWA highest levels. He who seeks equity must do equity. Viewing the claim as equitable, as I do, I do not deem a claimant that had conducted itself as inequitably as Pennsylvania has here, can require us still to reconstruct the agreement of the parties to allow Pennsylvania the small amounts the majority considers properly allowable. I would let all the loss lie where it has fallen.